**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

KENNETH MCGILL;
JENNIFER MCCRACKEN;

      Plaintiffs,

v.

CORRECTIONAL HEALTHCARE COMPANIES, INC. d/b/a "CORRECTIONAL
HEALTHCARE MANAGEMENT, INC.";
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
CHC COMPANIES, INC.;
BOARD OF COUNTY COMMISSIONERS FOR JEFFERSON COUNTY COLORADO;
TED MINK, in his official capacity as Jefferson County Sheriff only;
JAMES BRILL, individually;
GINA BATTENHOUSE, individually;

      Defendants.

_____

**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY AND
CERTIFICATE OF REVIEW**

_____

      Plaintiffs Kenneth McGill and Jennifer McCracken, by and through their attorneys,

HOLLAND, HOLLAND EDWARDS & GROSSMAN, P.C., complain against Defendants and request a

trial by jury as follows:

## I.      INTRODUCTION

     1.   This is an action brought by Kenneth McGill, a 44 year old man, and his wife, Jennifer

McCracken, to vindicate serious deprivations of their constitutional and state law rights.

     2.   Mr. McGill is a former inmate at Jefferson County Detention Facility who suffered a

severe stroke while he was incarcerated.  Mr. McGill begged for medical care, telling staff that

he was having a stroke with a slurred voice, one-sided weakness, and facial drooping.

3.   Despite this knowledge, Mr. McGill was abandoned in a medical crisis while the stroke ravaged his brain for at least 16 hours after the obvious stroke symptoms began.

4.   Mr. McGill and other inmates repeatedly reported to multiple care-givers that he was clearly suffering a stroke, as his stroke signs and symptoms were so obvious that even lay people were able to recognize them.

5.   Still, for almost a full day, medical staff refused to help Mr. McGill and refused to send him to the hospital.

6.   Instead, Mr. McGill was left in a cell all night, lying on the concrete floor, knowing that he was having a stroke, terrified and thinking he was going to die.

7.   The next morning, Mr. McGill saw a doctor on staff, who told him he was clearly having a stroke.  Despite this high-level acknowledgement of the medical crisis, this doctor and this jail still did not transfer him to the hospital for several hours.

8.   By the time Mr. McGill was brought to the hospital, it was far too late to reverse or even stem the damage from the stroke, and he is now left with major permanent disabilities.

9.   Mr. McGill cannot return to work or earn a living, and also suffers serious emotional and physical harm from these deliberately indifferent and negligent acts.

10.   Jennifer McCracken, Mr. McGill's wife, also suffers from associated losses of consortium and deprivations of her constitutional rights.

## II.       JURISDICTION, VENUE, AND NOTICE

11.   This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. §

1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

12.     This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

13.     Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

14.     The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act. However, such notice was timely given.

### III.      PARTIES

11.     Plaintiff Kenneth McGill is a resident of the State of Colorado and a citizen of the United States of America.

12.     Plaintiff Jennifer McCracken is a resident of the State of Colorado and a citizen of the United States of America.

13.     Both Plaintiffs reside in Denver.

14.     Defendant Correctional Healthcare Companies, Inc., d/b/a Correctional Healthcare Management, Inc., is a private Delaware corporation with its principal street address and registered agent of service located at 6200 S. Syracuse Way, Suite 440, Greenwood Village, CO 80111.  On information and belief this company contracts with Jefferson County to provide medical services to inmates and detainees at Jefferson County Detention Facility and supervises

and implements such care.

15.     Defendant CHC Companies, Inc. is a Delaware corporation with its principal street address and registered agent of service located at 6200 S. Syracuse Way, Suite 440, Greenwood Village, CO 80111. On information and belief this company contracts with Jefferson County to provide medical services to inmates and detainees at Jefferson County Detention Facility and supervises and implements such care.

16.     Defendant Correctional Healthcare Physicians, P.C. is a Colorado corporation with its principal street address and registered agent of service at 6200 S. Syracuse Way, Suite 440 Greenwood Village, CO 80111. On information and belief, this Defendant contracts with Defendant Brill to provide physician services to inmates and detainees at Jefferson County Detention Facility and implements such care.

17.     Defendant Correctional Healthcare Companies, Inc., d/b/a Correctional Healthcare Management, Inc., Correctional Healthcare Physicians, P.C., and Defendant CHC Companies, Inc. are herein after collectively referred to as the "CHC Defendants."

18.     CHC Defendants are proper entities to be sued under 42 U.S.C. § 1983 for their deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

19.     CHC Defendants are also properly sued for negligence as they are private corporations, not entitled to any immunity under the Colorado Governmental Immunity Act.

20.     CHC Defendants are sued directly and indirectly for negligence, negligent supervision, negligent training of their staff, for failing to ensure the provision of appropriate

care in the treatment of Mr. McGill, and for the acts and omissions of their agents and/or employees, and for the herein described acts by their involved employees, agents, staff, and affiliates, all while acting within the scope and course of their employment.

21.     Defendant Board of County Commissioners for Jefferson County Colorado is the public entity responsible for Jefferson County and the Jefferson County Detention Facility. Defendant Board of County Commissioner for Jefferson County is a proper entity to be sued under 42 U.S.C. § 1983.

22.     Jefferson County Sheriff Ted Mink, in his official capacity only, is the public figure responsible for Jefferson County Sheriff's Department and the Jefferson County Detention Facility.  Defendant Mink is a proper party to be sued under 42 U.S.C. § 1983.

23.     Defendant Board of County Commissioners for Jefferson County and Defendant Mink are collectively referred to as "Jefferson County Defendants."

24.     Jefferson County Defendants are properly sued under 42 U.S.C. § 1983 for the challenged delegated final decisions of individual Defendants and CHC Defendants acting as its contractual final delegated decision makers, with respect to the hereinafter challenged deliberately indifferent policies and practices for the care and treatment of persons incarcerated at Jefferson County Detention Facility who have serious and emergent medical needs.

25.     Jefferson County Defendants and CHC Defendants are also properly sued under 42 U.S.C. 1983 for the challenged policies and delegated final decision maker decisions resulting in intentional interference with familial relations.

26.     On information and belief, at all times relevant hereto, Defendant James Brill, M.D., was an employee of CHC Defendants, staffed as a doctor at the Jefferson County

Detention Facility, 200 Jefferson County Parkway, Golden, CO 80401.

27.     On information and belief, Defendant Gina Battenhouse is a resident of Colorado and a citizen of the United States of America, and an employee of CHC Defendants.

## IV.     STATEMENT OF FACTS

28.     Mr. McGill was serving a sentence at Jefferson County Detention Facility for misdemeanor alcohol related driving offenses.

29.     On the morning of September 17, 2012, Mr. McGill was working on kitchen duty.

30.     While working in the kitchen, Mr. McGill began to feel dizzy and have a headache.  He told his Aramark supervisor, Ted (last name currently unknown), that he wasn't feeling well.

31.     Mr. McGill stayed on his shift until Ryan (last name currently unknown) with inmate services, who also works with kitchen staff, came into the kitchen.  When Mr. McGill told him how he was feeling, Ryan took Mr. McGill down to medical.

32.     At 12:23 p.m., Mr. McGill was seen by Tracy Haynes, LPN.

33.     Nurse Haynes set an appointment with a "mid level provider" for Mr. McGill based on "C/O increased dizziness and headaches.  Feels like it may be vertigo.  Please assess."

34.     Nurse Haynes designated this appointment as a priority level 1 (with 1 being the highest).

35.     After setting this appointment, Nurse Haynes and other medical staff told Mr. McGill that he was probably just dehydrated, instructing him to drink water.

36.     Mr. McGill was sent back to his "pod" and tried to rest until dinner.

37.     While trying to go to dinner, however, Mr. McGill was feeling dizzy and having

trouble going down the stairs.  He was holding on to the rail with both hands when he slipped and missed the bottom step.

38.     Deputy Vowers came over and Mr. McGill told him that he was unable to balance himself.  Deputy Vowers then transported Mr. McGill to medical in a wheelchair.

39.     On September 17, 2012 at around 5:06 p.m., Matt Killough, PAC, saw Mr. McGill.

40.     Mr. Killough made the following chart entry: "44 y/o male presents to clinic c/o intermittent dizziness with posterior HA and neck pain."

41.     P. A. Killough also noted that Mr. McGill was "currently in wheelchair and unable to walk to clinic."

42.     P.A. Killough tested Mr. McGill for benign paroxysmal positional vertigo, finding him to test negative.

43.     Despite such negative testing, P.A. Killough's assessment of Mr. McGill was that he either had "migraine associated vertigo" or benign paroxysmal positional vertigo. P.A. Killough made another mid level practitioner priority 1 level appointment for "f/u dizziness/vertigo."

44.     The classic warning signs for a brain stem stroke include vertigo and headache. Vertigo often hits well before the stroke occurs and causes people to feel unsteady, dizzy, and as though the room is tilting.

45.     During this exam, P.A. Killough also went back and forth between Mr. McGill and another room where there was a doctor.

46.     On information and belief this was Dr. Brill. Defendant Brill did not come into

the room, despite the fact that Mr. McGill was brought in in a wheelchair complaining of severe vertigo.

47.     Although Dr. Brill did not physically evaluate Mr. McGill, he was involved with his care and treatment as his treating physician at this time, as he ordered a bed change from an upper bunk to a lower bunk on a lower floor in the jail.

48.     Mr. McGill's housing history report shows that he was moved from his upper bunk on a higher floor to "cave" MJ-4D-28 at 5:40 p.m.

49.     "Cave" is the term used for a group of beds within a "pod."

50.     He was having so much trouble balancing that two other inmates had to assist him in the housing move.

51.     At some point close after this move, there was a lock down for shift change and Deputy Powell came on duty.

52.     Mr. McGill and fellow inmate Gilbert Renteria told Deputy Powell that Mr. McGill needed help, and Deputy Powell responded that he needed to wait for a nurse that would be by shortly for med pass.

53.     While he was sitting in the common space, trying to watch the Broncos game, his symptoms dramatically escalated.

54.     He felt like his brain was stuck on something and he could not move his right side very well.

55.     Vance Goetz, another inmate, came over to him and saw that the right side of his face was plainly drooping and that his speech was slow and slurred.

56.     Mr. Goetz, who has had close family members with strokes, recognized the droop

-8-

and stroke affect, and told Mr. McGill that he believed he was having a stroke based on these similar symptoms.

57.     As Deputy Powell had just told Mr. McGill to wait for medical, and having been to medical several times with no one taking him seriously, he decided to try calling his wife to help him obtain medical assistance.

58.     Mr. McGill had difficulty walking to the phone and Mr. Goetz had to assist him and then help him dial the numbers.

59.     At 8:36 p.m., Mr. McGill made a 15-minute call home to his wife.

60.     During this recorded call, Mr. McGill is clearly in a serious medical crisis and sounds tearful and terrified.

61.     On the call, Mr. McGill is crying and slurring his words and reports, *inter alia*:

   a.   "I think I had a stroke today";

   b.   "I keep telling them, they keep taking me downstairs and not doing anything";

   c.   "I can't feel anything [incomprehensible].  My whole right side is like numb. I can't talk.  You don't know how hard it is to even talk";

   d.    "Something is really wrong";

   e.   "Jen, I'm really just scared"; "It keeps getting worse and worse.  And I can't [incomprehensible] the whole right side of my body now.  And I can't even talk.  I'm scared to death."

62.     Mr. McGill's speech was very noticeably slurred, leading his wife to tell him repeatedly that she could not understand him.

63.     Ms. McCracken became increasingly upset and worried as she could hear her

husband's slurred voice and obvious fear.

64.    Ms. McCracken didn't understand that Mr. McGill had been seen several times already by medical.

65.    Ms. McCracken, who had worked for a number of months as a guard in a prison, knew the only way to obtain urgent care is to go to the medical staff directly, which she urged him repeatedly to do.

66.    She told him that he had to get to the hospital immediately (noting that there is a hospital very near the jail), and that it was plainly obvious to anyone that he needed urgent medical attention.

67.    Mr. McGill had such difficulty speaking and explaining himself that Mr. Goetz had to take the phone and explain to Ms. McCracken what was happening.

68.    Mr. Goetz reported to Ms. McCracken, *inter alia*:

   a.   "Something is wrong with him;"

   b.   "Something is definitely wrong.  His speech and he is having a hard time walking;"

   c.   "It's definitely his right side, I mean his whole right side.  He is slurring his words, and his mouth, when he talks, his right side is dragging, you know what I mean and when I just got him up out of his chair, his right side is not working that well."

69.    Mr. Goetz also told Ms. McCracken that he thought her husband was having a stroke.

70.    Around this time, a nurse coming by for med pass and Deputy Powell approached

Mr. McGill, and helped him into a wheelchair.

71.     Mr. Goetz told Deputy Powell that this was a serious medical crisis and Mr. McGill needed to go to medical immediately.

72.     On the call, Mr. Goetz can be heard talking to a nurse and reporting: "I think he had a stroke." He further reports to the nurse: "it's his right side, the whole right side of his body."

73.     Mr. McGill was brought back to medical and seen by the charge nurse, Gina Battenhouse, RN, sometime between 8:50 and 9:15pm.

74.     Mr. McGill specifically told Nurse Battenhouse that he thought he was having a stroke and asked to see a doctor and go to the hospital, only to have her callously and with deliberate indifference respond: "Are you a doctor?  Have you had a stroke before?  What do you know about strokes?"

75.     Nurse Battenhouse knew that other inmates were reporting Mr. McGill's sudden speech changes, that Mr. McGill was reporting one-sided numbness, and undoubtedly, she saw the same facial droop that both these other lay inmates reported.

76.     Sudden numbness or weakness of face, arm or leg, particularly if it is on one side of the body, sudden trouble walking or loss of balance or dizziness, sudden severe headache, and sudden speech changes are all well known individual emergency warning signs of a stroke and mandate an emergency call to 911 or transfer to the hospital.

77.     Despite the slurring, limited right side movement, and repeated statements about having a stroke evident on the call just minutes before this assessment, Nurse Battenhouse, recklessly and with deliberate indifference did not chart any of these obvious symptoms of a

stroke medical crisis.

78.     Nurse Battenhouse merely charted the following: "I/D brought to medical with c/o dizziness/anxiety.  I/D brought in wheelchair … I/D states tingling feeling on right side."

79.     Nurse Battenhouse also did not chart that Mr. McGill's face was drooping.

80.     This Defendant falsely reported four times that his gait was normal and he could walk around the room.

81.     Mr. McGill was not able to walk normally at this point, however, which was why he was brought in a wheelchair.

82.     These instances of false charting are irreconcilable with what is known to have been the true state of his condition and were done intentionally and/or recklessly.

83.     Medical staff consciously decided to ignore Mr. McGill's serious medical needs, complaints and known medical crisis and Nurse Battenhouse simply sent Mr. McGill back to his bed.

84.     When Mr. McGill tried to walk back to his pod, he faltered just outside the nursing station and Deputy Powell brought him a wheelchair.

85.     Deputy Powell then called Mr. McGill's wife and told her that Mr. McGill was fine, having been falsely told by the reckless Nurse Battenhouse that he was only having a panic attack.

86.     Deputy Powell also notes that: "McGill was on the dayroom phone tonight with his wife when another I/D informed me that McGill was talking funny and acting strange… Nurse Daria spoke with McGill and decided that he needed to be seen by the charge nurse in medical … Gina believed it was high anxiety which caused him to hyperventilate and for his

right side to feel numb."

87.    Mr. McGill was returned to his new "cave" preparing for lock down.

88.    Mr. McGill did not sleep, as is falsely claimed in the records, but attempted to lie down and see if rest would help with anything, having been told that he could not see a doctor or get higher-level medical assessment.

89.    While he was sitting in his new bed, another inmate, Mike Moore, entered the "cave."

90.    Mr. Moore had previously worked as a paramedic.  He asked Mr. McGill to smile and saw that only the left side of Mr. McGill's face moved normally.  He saw drool coming from Mr. McGill's right side of his mouth.

91.    He asked Mr. McGill to try squeezing his hands and noted that his grips were unequal.  He witnessed Mr. McGill having trouble ambulating and that he was having right-sided weakness.

92.    Mr. Moore told Mr. McGill that he was "watching him have a stroke."

93.    Mr. Moore convinced Deputy Powell to send a nurse to the "cave."

94.    The nurse, believed to be Nurse Daria (last name unknown), came and assessed Mr. McGill.  "Can't you see that he is displaying all of the signs of a stroke?" Mr. Moore asked the nurse. She callously responded something to the effect of "I'm just here to give him an ibuprofen."

95.    She performed no assessment of her own at that time.

96.    Mr. Moore had to assist Mr. McGill to the toilet due to his inability to control his bladder during this crisis.

-13-

97.     Mr. Moore continued to advocate for Mr. McGill, only to be threatened to mind his own business or be subject to jail sanctions.  Deputy Powell had also told Mr. Renteria and others to stop "working [Mr. McGill] up."

98.     Mr. McGill continued to decline. At one point Mr. Renteria approached Deputy Powell and said "you guys are screwing this up, he is having a stroke right now."  Mr. Moore also repeatedly entreated Deputy Powell to help Mr. McGill.

99.     Concerned and persistent inmates finally convinced Deputy Powell to take him back to medical. This was near midnight.

100.     Thus, at 11:54, Rachael Conner, LPN reports that Mr. McGill "tearfully" told her "it feels like my whole R side is dead." She also reports that he told her: "I just want to see a Dr.; I need to go to the hospital."

101.     Nurse Conner recorded these desperate pleas for help, noted that he had "guarded gait" and "slowed" speech and negligently and with deliberate indifference to his serious medical needs, still did not call for emergency help.

102.     When Mr. McGill had to go to the bathroom while in medical and couldn't ambulate himself, Nurse Conner said to him "we know you can do it, we aren't here to take you to the bathroom."

103.     When he told her that he couldn't swallow and that he couldn't hold the cup, Nurse Conner ignored this additional serious symptom, did not call a doctor to report swallowing difficulties, and instead dumped out the liquid and told him to eat the sugary part at the bottom.

104.     At 1:18 am, Defendant Battenhouse notes that Mr. McGill will be sent back to his pod soon, but then suddenly changes her mind, without any explanation in the record of her

observations or reasoning for the change, stating instead at 1:59 am that Mr. McGill "will be housed in SHU for OBS until seen by Dr. for safety." She also falsely stated that he would be given a "boat" on the floor.

105.    A "boat" is a device which has a mattress for the resident to sleep on when he can't get into a bunk or when the other bed is full.

106.    In this same note, Defendant Battenhouse acknowledges the complaint of right-sided issues, but again fails to chart Mr. McGill's complaints and signs of stroke, instead noting "No hx of stroke or TIA."

107.    The SHU is also called the "hole" and is where inmates are put as punishment for various offenses.

108.    The SHU room into which Mr. McGill was placed had one mattress bed, which was occupied by another resident.

109.    He was never given a boat or mattress. He was intentionally and punitively left to lay on the concrete floor of the special housing unit, thinking he was dying – for almost seven hours.

110.    Mr. McGill started yelling that he needed help, that he was dying, that he needed a doctor, but the deputy and Nurse Battenhouse both became angry with him and cruelly instructed him to "shut up."

111.    Nurse Battenhouse noted at 5:42 am, again falsely, that Mr. McGill was sleeping and that he was able to eat his breakfast. Mr. McGill did not sleep and was unable to swallow liquid or food.

112.    Mr. McGill reported to her that he could not swallow.

113.   Nurse Battenhouse does finally note "I/D weak on right side" but then deliberately falsely stated "swallowing just fine" and "able to ambulate."

114.   Mr. McGill heard a deputy say that there would be lock down for a shift change. Knowing that Nurse Battenhouse would finally go off duty and a new nurse would be in, Mr. McGill spent an hour crawling across the floor to ring the bell for help.

115.   While the progressing stroke destroyed more of his brain, he was abandoned on the hard floor, believing he was dying.

116.   His fellow inmate in the SHU (name currently unknown) told him not to ask for help, that he was going to get them in trouble, and said to him "don't die with me in here."

117.   It wasn't until this shift change that Mr. McGill's statements that he is having a stroke, which he was making since at least 8:30 the night before, are finally noted in the record for the first time.

118.   Thus Nurse Guthrie states: "Patient is found standing in cell at door.  The patient is tearful and states that he believes he is having a stroke."

119.   Nurse Guthrie assessed Mr. McGill, noting that his grips were not equal.  She then states that the patient refuses to cooperate with the exam to assess for "facial palsy" when in fact he was simply unable to perform the tests she requested of him. She further notes that she gave him a "teaspoon of water and handles it well without coughing."

120.   Mr. McGill did not refuse to cooperate with the exam.

121.   This teaspoon of water test was performed because Mr. McGill was complaining that he could not swallow normally.

122.   Mr. McGill was unable to swallow and actually told her "it feels like my face is in

-16-

my lap."

123.    Also during this 7:38 visit with Nurse Guthrie, she noted that his blood pressure had spiked considerably from his baseline to 154/100.  This is a very high blood pressure for Mr. McGill with his baseline being much closer to 120-30/80.

124.    The lack of perfusion was now actively destroying Mr. McGill's brain tissue.  He had yet *another* nurse who knew about his weakness, his slurred speech, his perception that he was having a stroke, his swallowing problems, his intense fear, and his facial droop but with deliberate indifference still no emergent care was arranged.

125.    Nurse Guthrie did finally call Dr. Brill.

126.    Mr. McGill was moved to the assessment cell to be seen by Dr. Brill, who did not see him for over an hour after the call from Nurse Guthrie, around 9:00 a.m.

127.    Dr. Brill reports that Mr. McGill is complaining of "difficulty moving right side and difficulty with speech."

128.    Dr. Brill then goes on to synopsize Mr. McGill's recent complaints stating: "yesterday noted dizziness … later noted posterior headache, difficulty with depth perception, then reported right sided weakness, had fall in hall way and was put in SHU o/n, Multiple RN and PA and other assessments without conclusion.  This am ID is complaining of difficulty with speech, and right sided weakness, right arm more weak than right leg."

129.    Dr. Brill reports in the objective portion of his notes that Mr. McGill is "tearful" and "frightened" and that he is "not moving right arm spontaneously and slurring speech."

130.    He finds "Right central facial weakness, weak right shoulder shrug and turn of

head to right.  Weak right arm with pronator drift, left leg is weak but not as weak as the arm."[1]

131.   At this point, instead of emergently transporting Mr. McGill, he called in nursing staff in front of Mr. McGill and yelled at them for ignoring an obvious stroke.

132.   Dr. Brill picked up his arm and said, "look at his arm, look how it is drifting."

133.   Nurse Guthrie sees Mr. McGill right before this assessment by Dr. Brill and "patient ambulated to bathroom in exam room with out difficulty and unassisted."

134.   She sees him again right after Dr. Brill concluded that he was having a stroke and she again notes "[p]atient ambulated to restroom without assistance and no concerns were voiced."

135.   At 9:45 a.m., Dr. Brill orders outside evaluation for an MRI.

136.   Dr. Brill inappropriately arranged for an outpatient MRI rather than for an emergent CT scan.

137.   Dr. Brill knew this was a stroke, and yet negligently and with deliberate indifference failed to make STAT orders or call an ambulance.  He either also failed to communicate the emergency nature of his findings to jail staff, or jail staff didn't care and Mr. McGill was thus left to languish for hours more.

138.   It took deputies significant time to get him into and out of the van in his debilitated condition.

139.   Deputies handcuffed and shackled Mr. McGill while driving him to the hospital.

140.   Because he was basically paralyzed on his right side, he could not sit up and fell and slid across the van during turns.

---

[1] This is believed to be a typo by Dr. Brill, it was Mr. McGill's right leg, not his left leg.

141.    The deputies cruelly laughed at him.

142.    One female deputy said to him something along the lines of: "you can stop pretending, you are getting what you wanted."

143.    Deputies took Mr. McGill to the out-patient area at Lutheran, increasing even further the delay in getting emergent treatment.

144.    Mr. McGill should have been taken directly to the hospital in an ambulance.

145.    At 1:00 p.m. Lutheran medical staff called Dr. Brill to discuss the findings of the MRI study, which revealed an "acute left pontine infarct."

146.    An infarct is an area of dead tissue caused by lack of oxygen to the area.

147.    Mr. McGill had an ischemic stroke, which caused a lack of blood flow to his brain causing a large infarct.

148.    In a disturbing late charting and/or deliberately false charting entry, 36 minutes later P. A. Matthew Killough made an "addendum" to his previous notes regarding Mr. McGill. He now falsely notes "Pt speaking normally during exam.  Grips equal during exam, reflexes symmetrical."

149.    Clearly, if Mr. Killough had evaluated Mr. McGill's grip strength or reflexes that should have and would have been charted at the time the patient was seen.

150.    This is post hoc defensive charting by a medical professional and may well be evidence of a cover-up.

151.    Finally at Lutheran outpatient, the MRI indicated a stroke and Mr. McGill was carted over to the emergency room, went through intake and, well over sixteen hours after the likely beginning of his first stroke and at least six hours after his spike in blood pressure and

further worsening of symptoms, Mr. McGill was hospitalized.

152.    By this point, it was too late for Mr. McGill to have serious intervention for his stroke as far too much of his tissue had been allowed to die.

153.    While Mr. McGill was in the hospital, Mr. McGill's mental function was moving very slowly.  He was unable to give a full history and deputies spoke for him, providing incomplete and inaccurate histories.

154.    Deputies then refused to allow him to communicate with his wife and refused to communicate with his wife for him.  He was thus denied access to proxy medical decision makers during this critical time.

155.    On information and belief, deputies told Lutheran Hospital that Mr. McGill was a Do No Resuscitate code status, and this was put into the computer system about Mr. McGill.

156.    This means that Mr. McGill, who was unable to communicate clearly, and who had been denied his proxy emergency medical decision maker wife, was listed as DNR and would have been allowed to die without intervention had further crisis occur.

157.    Ms. McCracken, having been told by Deputy Powell that Mr. McGill was fine the night before, went by the jail to see him the next day.

158.    When she arrived at the jail she was told that he was no longer there, that he had been sent to the hospital, but that it "wasn't an emergency" or she would have been notified.

159.    Jail staff told her it was "against policy" to inform her about her husband's medical care, even though she is his wife and listed emergency contact.

160.    Ms. McCracken, and Mr. McGill's mother, Joanne McGill, spent the next few days calling hospitals and even wandering through hospitals desperately trying to find Mr.

-20-

McGill.  They were unable to obtain any information from law enforcement or medical staff despite repeated requests, which were purposely ignored.

161.    Ms. McCracken was repeatedly told by jail staff that "policy" required that he fill out an authorization form before they could tell her anything, while they also refused to present him with such a form.

162.    Mr. McGill was also asking at the same time for whatever forms he needed to be able to inform his wife so she could be there and help him make medical decisions during this crisis.

163.    On information and belief, individual deputies were specifically prevented from presenting Mr. McGill with this form.

164.    For days Ms. McCracken was kept from knowing any information about her husband.

165.    A few days into the stay at Lutheran, Mr. McGill was allowed to use a phone to try to order his meal as an aspect of physical therapy, practicing regaining his speech.

166.    He instead used the phone to call Ms. McCracken and tell her where he was.

167.    She immediately came to the hospital.

168.    They were able to visit only for a few minutes before the deputy told her she had to leave.

169.    Mr. McGill was transferred the next day to Boulder Community Hospital, again with no information given to Ms. McCracken, further intentionally interfering with this marital relationship.

170.    She spent the week calling and wandering through stroke units looking for Mr.

McGill.

171.    It did not occur to her that Jefferson County could move him out of the Denver Metro area and so she was not able to find her husband.

172.    Mr. McGill asked several times every shift for a release of information form so he could authorize his wife to know where he was and to try to be able to talk to her.

173.    He was also repeatedly told by the deputies that he was not allowed to call his family from the hospital.

174.    It was at Boulder that Mr. McGill learned he was listed as a DNR.  A nurse came to him and said: "do you really want to die?"

175.    Mr. McGill had been fighting for his life.  He wanted to live.  He needed the ability to speak for himself or to be in contact with people who loved him to help him communicate medical decisions.

176.    Mr. McGill threatened to check himself out against medical advice, because then he would be taken back to the jail where he could at least call his family.

177.    Only upon the threat of having to take a dependent and disabled man back to jail, where they knew they couldn't care for his now advanced needs, did upper level jail staff relent in their purposeful interference with this family relationship.

178.    Mr. McGill was given a phone and called his wife, who he had not spoken to since he left Lutheran.

179.    After Ms. McCracken informed the Court what was happening, the Court Ordered Mr. McGill released from jail.

180.    Mr. McGill is now a little over seven months out from this 24-hour nightmare and

his entire universe is different.

181.    He still suffers from some right-sided paralysis.  He walks very slowly.  He has difficulty with speech and speaks very slowly.

182.    Mr. McGill's right hand and grip are severely compromised.

183.     It takes him a very long time to sign his name.

184.    His rotator cuff on his right side is damaged; he has significant trouble lifting his right arm.

185.    His right hip and hamstring are difficult for him to use and walking is much more difficult.  He has had to relearn a gait and it makes him walk much more slowly.

186.    His vestibular nerves have been affected and he is constantly dizzy. He always feels like the room is spinning, like he is going to fall over.  Because of this dizziness, Mr. McGill has to wear a neck patch to try to help with these symptoms.

187.    This patch also has a host of side effects, including constant irritation of his skin, callousing, pain, and significant discomfort.  Without the patch, Mr. McGill is so dizzy he can hardly walk.

188.    He has participated in extensive rehabilitation and hopes for further improvement, but he has been told by his treating physician and other medical professionals that his recovery has hit a plateau and it is expected he will have these persisting symptoms for the rest of his life.

189.    He has been told he will never return to his work.

190.    To a reasonable degree of medical certainty, these negligent and deliberately indifferent delays prevented Mr. McGill from having a full recovery.

191.    Mr. McGill's doctor believes that it very medically probable he would have been

able to return to work and would not have suffered the debilitating dizziness and motor issues that he currently suffers, had he not been abandoned in this clear medical crisis.

192.     The involved care givers acted in concert in this dereliction of duty.

193.     As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff has been substantially injured. These injuries include, but are not limited to, loss of constitutional rights, physical injuries, impairments and disfigurement, great pain and emotional distress, anxiety, shock, sadness, depression, anger, stress, and special damages for medically related treatment caused by the unconstitutional, negligent, and atrocious conduct of these Defendants.

194.     Mr. McGill has significant physical, economic, and emotional damages as a result of his suffering and not being timely treated for his stroke.

195.     As a direct and proximate result, Mr. McGill also has substantially impaired earnings capacity, substantial and ongoing lost past and future earnings in amounts that will be proven and fully ascertained at trial.  He worked as a contracting estimator for over 15 years.  He is no longer able to work and will likely not be able to work again.  He has lost substantial annual income and benefits and his full economic loss is not yet ascertained.

196.     Mr. McGill also suffers severe emotional distress as a result of these events, including their ongoing sequelae.

197.     These events have had a significant impact on Mr. McGill's relationship with his wife, significantly interfering with intimacy and turning their relationship from that of a husband and wife into one more like that of a caregiver and patient.

198.     Ms. McCracken suffers loss of affection, society, intimacy, companionship, aid

-24-

and comfort.  She has also suffered economic losses for loss of household services.

199.    During the time Ms. McCracken was unable to find or contact her husband, she and Mr. McGill both suffered emotional distress, upset, anxiety, and worry.  Mr. McGill was also without the aid of a proxy medical decision maker.

200.    Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiff, entitling him to punitive damages.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Eighth Amendment Prohibition Against Cruel and Unusual Punishment
(Plaintiff McGill against Individual CHC Defendants)

201.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

202.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

203.    Plaintiff is a citizen of the United States and all of the Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

204.    Plaintiff had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs.

205.    All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law.

206.     Individual Defendants as willful participants in a joint activity actually knew of Mr. McGill's onset of stroke symptoms and deteriorating condition and nonetheless, with deliberate indifference, decided not to chart the symptoms and provide him with or secure for him obviously necessary urgent medical care.  They did so despite being expressly aware of Plaintiff's known serious medical needs and recklessly disregarding a substantial risk of physical harm to Plaintiff.

207.     Individual Defendants continued to act in bad faith and with deliberate indifference to Plaintiff's serious medical needs and constitutional rights when they willfully ignored his repeated requests for medical attention and intentionally denied and/or delayed his access to medical care.

208.     Individual Defendants are not entitled to qualified immunity.

209.     Each of the individual Defendants is liable to the Plaintiff for violation of 42 U.S.C. § 1983.

210.     Defendants were willful participants in a joint activity.

211.     The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and were moving forces and substantial significant contributing proximate causes of Plaintiff's injuries.

212.     As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling him to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

213.     As a further result of the Defendants' unlawful conduct, Plaintiff has incurred significant special damages, including medically related expenses and will continue to incur

further medically related expenses in amounts to be established at trial.

214.    Plaintiff has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

215.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

216.    Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

## SECOND CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
**Eighth Amendment Prohibition Against Cruel and Unusual Punishment**
(Plaintiff McGill against Jefferson County Defendants and CHC Defendants)

217.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

218.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

219.    Plaintiff is a citizen of the United States and the Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

220.    Plaintiff had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs.

221.     CHC Defendants to this claim, at all times relevant hereto, were acting under the color of state law, as the functional equivalent of a municipality providing medical care to inmates.

222.     Jefferson County Defendants, at all times relevant hereto, were acting under the color of state law and had a non-delegable duty to provide constitutionally adequate medical care for inmates.

223.     Jefferson County Defendants and the CHC Defendants are sued herein for their deliberately indifferent policies, practices, habits, customs and widespread usages with respect to the serious medical needs of inmates like this Plaintiff, and for their deliberately indifferent failures in training and supervising its employees, including individual Defendants.

224.     Jefferson County Defendants and the CHC Defendants deliberately indifferent failures to train, supervise, or create coherent relevant policies, are all actionable policy decisions and moving forces and substantial significantly contributing proximate causes of the violation of Mr. McGill's constitutional rights.

225.     Defendants were willful participants in a joint activity.

226.     Further, by their complained of series and pattern of intentional actions and inactions, *de facto* policies, customs, habits, usages, and delegated final decision makers' decisions, these Defendants acted or failed to act in bad faith and with deliberate indifference to the obvious serious medical needs of patients and inmates.

227.     On information and belief, these Defendants knew that potentially serious or fatal consequences could be suffered by such individuals (including Mr. McGill) by their challenged policies and practices and by their failures to properly train and supervise medical care and/or

develop adequate policies.

228.    As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling him to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

229.    As a further result of the Defendants' unlawful conduct, Plaintiff has incurred special damages, including significant medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

230.    Plaintiff also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

231.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

232.    Plaintiff also seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress Defendants' ongoing deliberate indifference in policies, training and supervision with respect to the serious medical needs of patients and inmates in violation of the Eighth Amendment of the Constitution.

### THIRD CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Fourteenth Amendment Due Process Right to Familial Association
(Plaintiffs against Jefferson County Defendants and CHC Defendants)

233.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

234.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be

subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

235. Plaintiffs are citizens of the United States and the Defendants are persons for purposes of 42 U.S.C. § 1983.

236. Plaintiffs had a clearly established right under the Fourteenth Amendment to familial association.

237. CHC Defendants to this claim, at all times relevant hereto, were acting under the color of state law, as the functional equivalent of a municipality in this context.

238. Jefferson County Defendant, at all times relevant hereto, was acting under the color of state law.

239. Jefferson County Defendants and the CHC Defendants are sued herein for their deliberately indifferent policies, training, practices, habits, customs and widespread usages with respect to rights of inmates with serious medical needs to have intimate family members be notified, and participate in their care, particularly when they are unable to do so for themselves and when such family members are the emergency contact, next of kin, and/or health care proxies.

240. Defendants were willful participants in a joint activity.

241. Defendants' intentionally misled Plaintiffs, in that, *inter alia*, Ms. McCracken was mislead by jail and medical staff that Mr. McGill was not in a medical crises, then told that he was hospitalized but that it was not an emergency, and then twice not informed where her husband was taken. Jail and medical staff intentionally refused to allow Mr. McGill to execute a

release such that this wife could be present with him in the hospital or know what was going on, depriving them both of familial relations and Mr. McGill of a proxy medical decision maker.

242.    By their complained of series and pattern of intentional actions, *de facto* policies, customs, habits, usages, and decisions, these Defendants acted with the intent to interfere in the spousal relationship of Plaintiffs, protected by their clearly established right to freedom of intimate association.

243.    Defendants' policies, customs, delegated final decision makers' decisions, practices and/or deliberately indifferent failures to supervise or train were also moving forces and substantial significant contributing proximate causes of the violation of Plaintiffs' rights.

244.    As a direct result of Defendants' unlawful conduct, Plaintiffs have suffered injuries, damages and losses as described herein entitling them to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

245.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

246.    Plaintiffs also seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress Defendants' ongoing deliberate indifference in policies, training and supervision with respect to the needs of patients and inmates who are receiving care for their serious medical needs to have access to their intimate family members for participation and input in their care when they are the emergency contact person in their medical records, or next of kin.

### FOURTH CLAIM FOR RELIEF
### Negligence and Loss of Consortium
(Plaintiffs against CHC Defendants and Dr. Brill)

247.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set

forth herein.

248.     CHC Defendants are private corporations that contract to provide medical care

and health services to inmates at Jefferson County Detention Facility.

249.     The individual Defendants are also private individuals, not public officials.

250.     Defendants to this claim are properly sued for state law negligence as they are

private corporations and therefore are not entitled to any immunity under the Colorado

Governmental Immunity Act.

251.     At all times relevant hereto, Plaintiff McGill was under the care and treatment of

the CHC Defendants' staff, including individual Defendants, through their contractual

relationship with Jefferson County.

252.     The CHC Defendants are vicariously liable for the negligent acts and omissions

by its agents and/or employees including those named individually herein, and directly liable for

their own negligent failures in training, policies, and practices.

253.     Defendants had a duty to provide reasonable medical care and treatment to

inmates at Jefferson County, including Mr. McGill, and to exercise reasonable care in the

training and supervision of their employees.

254.     These duties of care are informed by state law.  Under C.R.S. 16-3-401,

"prisoners arrested or in custody shall be treated humanely and provided with adequate food,

shelter, and, if required, medical treatment."  The provision of adequate medical treatment and

humane care is a statutory obligation under this and other statutes.  These duties are also

informed by NCCHC standards.

255.     Dr. Brill and employees of the CHC Defendants, while acting within the scope of

their employment, variously committed negligent acts and omissions as set forth herein with respect to the care and treatment of Plaintiff McGill.

256.    Dr. Brill had a doctor-patient relationship with Plaintiff at all times pertinent to this Complaint.

257.    Nurse Battenhouse had a nurse-patient relationship with Plaintiff and was acting or failing to act within the scope of her employment with CHC Defendants at all times pertinent to this Complaint.

258.    Other caregivers at the jail involved in the negligent treatment of Mr. McGill were acting within the scope of their employment with CHC related Defendants.

259.    Involved caregivers at the jail, including Dr. Brill, Nurse Battenhouse and others named in the Statement of Facts, owed Mr. McGill a duty to exercise that degree of care, skill, caution, diligence and foresight exercised by and expected of nurses in similar situations.

260.    Involved caregivers at the jail, including Dr. Brill, Nurse Battenhouse and others named in the Statement of Facts, grossly deviated from that standard of care and were negligent in failing to properly care for and treat Plaintiff McGill's known serious medical needs in the health care services they failed to provide.  *Inter alia,* they further breached that duty of care in negligently failing to properly assess Mr. McGill, negligently charting his symptoms and complaints, negligently failing to call for a higher level evaluation and negligently failing to urgently transport him during a clear medical emergency.

261.    Defendants, directly and/or through their agents and employees, had at least a tacit understanding and consciously conspired and deliberately pursued a common plan or design to commit a tortious act.

-33-

262.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff McGill suffered significant physical pain, emotional suffering, permanent disability, and other damages.

263.    Plaintiff McGill is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages for past and future medical and health care related expenses, all in amounts to be proven at trial.

264.    Mr. McGill has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

265.    As a result of Defendants' negligence pled herein, Plaintiff McCracken was substantially injured in her relationship with her spouse, and has suffered and is entitled to non-economic damages in that she has suffered loss of affection, society, intimacy, companionship, aid and comfort.

266.    Plaintiff McCracken has also suffered and is entitled to economic damages for loss of household services.

267.    Plaintiffs hereby give notice that they may be seeking to amend the complaint to add punitive damages against these Defendants because the injuries complained of are attended by circumstances of fraud, malice or willful and wanton conduct engaged in by their employees and agents.

## VI.    PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and enter the following relief:

1.   Award Plaintiffs compensatory, non economic, consequential and economic damages

as proven at trial against all of the Defendants;

2.   Award Plaintiffs special damages as proven at trial;

3.   Award Plaintiffs punitive damages relating to the federal claims brought in this matter against Individual Defendants and Private CHC Defendants;

4.   Award Plaintiffs punitive damages relating to the state law claims should Plaintiffs file suitable amendment of the complaint;

5.   Award Plaintiffs attorneys' fees and costs pursuant to the provisions of 42 U.S.C. §1988;

6.   Award Plaintiffs attorneys' fees and costs as provided for under all applicable federal and state statutes;

7.   Award Plaintiffs actual and treble damages as well as attorneys fees and costs under the CCPA.

8.   Award Plaintiffs interest from the earliest possible date under appropriate federal and state statutes;

9.   Grant a preliminary and permanent injunction and corresponding declaratory relief pursuant to F.R.C.P. 57 and 65 compelling entity Defendants to develop and implement constitutional policies, training and supervision of their agents and employees for the care and treatment of incarcerated persons showing signs and symptoms of strokes;

10.  Grant a preliminary and permanent injunction and corresponding declaratory relief pursuant to F.R.C.P. 57 and 65 compelling entity Defendants to develop and implement constitutional policies, training and supervision of their agents and employees with respect to the rights of inmates to familial association, especially with respect to medical emergency contact

and proxy decision making authority;

11. All other appropriate relief at law and equity.

PLAINTIFFS RESPECTFULLY REQUEST A JURY TRIAL ON ALL TRIABLE ISSUES.

/s/ Anna Holland Edwards
Anna C. Holland Edwards
Erica T. Grossman
John R. Holland
HOLLAND, HOLLAND EDWARDS & GROSSMAN, PC
1437 High Street
Denver, CO  80218

## CERTIFICATE OF REVIEW

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has extensive expertise in the areas of alleged negligence and deliberate indifference to serious medical needs and that this professional has reviewed the known facts, including such records, documents, and other materials as he has found to be relevant to the complaint allegations of negligent acts and omissions, and has concluded that the filing of these claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.

/s/ Anna Holland Edwards
Anna Holland Edwards