**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-cv-01080-RBJ-BNB

KENNETH MCGILL

      Plaintiff,

v.

CORRECTIONAL HEALTHCARE COMPANIES, INC. d/b/a "CORRECTIONAL
HEALTHCARE MANAGEMENT, INC.";
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
CHC COMPANIES, INC.;
BOARD OF COUNTY COMMISSIONERS FOR JEFFERSON COUNTY COLORADO;
TED MINK, in his official capacity as Jefferson County Sheriff only;
JAMES BRILL, individually;
GINA BATTENHOUSE, individually;

      Defendants.

---

**FIRST AMENDED CIVIL RIGHTS COMPLAINT
WITH REQUEST FOR TRIAL BY JURY**

---

Plaintiff Kenneth McGill, by and through his attorneys, HOLLAND, HOLLAND EDWARDS
& GROSSMAN, P.C., complains against Defendants and request a trial by jury as follows:

**I.      INTRODUCTION**

1.  This is an action brought by Kenneth McGill, a 44-year-old man, to vindicate serious
deprivations of his constitutional and state law rights.

2.  Mr. McGill is a former inmate at Jefferson County Detention Facility who suffered a
severe stroke while he was incarcerated.  Mr. McGill begged for medical care, telling staff that
he was having a stroke with a slurred voice, one-sided weakness, and facial drooping.

3.  Despite this knowledge, Mr. McGill was abandoned in a medical crisis while the

stroke ravaged his brain for at least 16 hours after the obvious stroke symptoms began.

4.   Mr. McGill and other inmates repeatedly reported to multiple care-givers that he was clearly suffering a stroke, as his stroke signs and symptoms were so obvious that even lay people were able to recognize them.

5.   Still, for almost a full day, medical staff refused to help Mr. McGill and refused to send him to the hospital.

6.   Instead, Mr. McGill was left in a cell all night, lying on the concrete floor, knowing that he was having a stroke, terrified and thinking he was going to die.

7.   The next morning, Mr. McGill saw a doctor on staff, who told him he was clearly having a stroke.  Despite this high-level acknowledgement of the medical crisis, this doctor and this jail still did not transfer him to the hospital for several hours.

8.   By the time Mr. McGill was brought to the hospital, it was far too late to reverse or even stem the damage from the stroke, and he is now left with major permanent disabilities.

9.   Mr. McGill cannot return to work or earn a living, and also suffers serious emotional and physical harm from these deliberately indifferent and negligent acts.

## II.      JURISDICTION, VENUE, AND NOTICE

10.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

11.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and

omissions occurred and in which Defendants maintain offices and/or reside.

12.     Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

13.     The state law claims in this matter are brought against private corporations and therefore no notice of claims was required under the Colorado Governmental Immunity Act. However, such notice was timely given.

### III.     PARTIES

11.     Plaintiff Kenneth McGill is a resident of the State of Colorado and a citizen of the United States of America. Plaintiff resides in Denver.

12.     Defendant Correctional Healthcare Companies, Inc., d/b/a Correctional Healthcare Management, Inc., is a private Delaware corporation with its principal street address and registered agent of service located at 6200 S. Syracuse Way, Suite 440, Greenwood Village, CO 80111.  On information and belief this company contracts with Jefferson County to provide medical services to inmates and detainees at Jefferson County Detention Facility and supervises and implements such care.

13.     Defendant CHC Companies, Inc. is a Delaware corporation with its principal street address and registered agent of service located at 6200 S. Syracuse Way, Suite 440, Greenwood Village, CO 80111. On information and belief this company contracts with Jefferson County to provide medical services to inmates and detainees at Jefferson County Detention Facility and supervises and implements such care.

14.     Defendant Correctional Healthcare Physicians, P.C. is a Colorado corporation

with its principal street address and registered agent of service at 6200 S. Syracuse Way, Suite 440 Greenwood Village, CO 80111. On information and belief, this Defendant contracts with Defendant Brill to provide physician services to inmates and detainees at Jefferson County Detention Facility and implements such care.

15.     Defendant Correctional Healthcare Companies, Inc., d/b/a Correctional Healthcare Management, Inc., Correctional Healthcare Physicians, P.C., and Defendant CHC Companies, Inc. are herein after collectively referred to as the "CHC Defendants."

16.     CHC Defendants are proper entities to be sued under 42 U.S.C. § 1983 for their deliberately indifferent policies, practices, habits, customs, procedures, training and supervision of staff, including of individual Defendants, with respect to the provision of medical care and treatment for inmates with serious emergency medical needs.

17.     CHC Defendants are also properly sued for negligence as they are private corporations, not entitled to any immunity under the Colorado Governmental Immunity Act.

18.     CHC Defendants are sued directly and indirectly for negligence, negligent supervision, negligent training of their staff, for failing to ensure the provision of appropriate care in the treatment of Mr. McGill, and for the acts and omissions of their agents and/or employees, and for the herein described acts by their involved employees, agents, staff, and affiliates, all while acting within the scope and course of their employment.

19.     Defendant Board of County Commissioners for Jefferson County Colorado is the public entity responsible for Jefferson County and the Jefferson County Detention Facility. Defendant Board of County Commissioner for Jefferson County is a proper entity to be sued under 42 U.S.C. § 1983.

20.     Jefferson County Sheriff Ted Mink, in his official capacity only, is the public figure responsible for Jefferson County Sheriff's Department and the Jefferson County Detention Facility.  Defendant Mink is a proper party to be sued under 42 U.S.C. § 1983.

21.     Defendant Board of County Commissioners for Jefferson County and Defendant Mink are collectively referred to as "Jefferson County Defendants."

22.     Jefferson County Defendants are properly sued under 42 U.S.C. § 1983 for the challenged delegated final decisions of individual Defendants and CHC Defendants acting as its contractual final delegated decision makers, with respect to the hereinafter challenged deliberately indifferent policies and practices for the care and treatment of persons incarcerated at Jefferson County Detention Facility who have serious and emergent medical needs.

23.     Jefferson County Defendants and CHC Defendants are also properly sued under 42 U.S.C. 1983 for the challenged policies and delegated final decision maker decisions resulting in intentional interference with familial relations.

24.     Defendant James Brill, M.D., was an employee of CHC Defendants, staffed as a doctor at the Jefferson County Detention Facility, 200 Jefferson County Parkway, Golden, CO 80401.

25.     Defendant Gina Battenhouse is a resident of Colorado and a citizen of the United States of America, and an employee of CHC Defendants.

### IV.     STATEMENT OF FACTS

26.     Mr. McGill was serving a sentence at Jefferson County Detention Facility for misdemeanor alcohol related driving offenses.

27.     On the morning of September 17, 2012, Mr. McGill was working on kitchen duty.

28.     While working in the kitchen, Mr. McGill began to feel dizzy and have a headache.  He told his Aramark supervisor, Ted (last name currently unknown), that he wasn't feeling well.

29.     Mr. McGill stayed on his shift until Ryan (last name currently unknown) with inmate services, who also works with kitchen staff, came into the kitchen.  When Mr. McGill told him how he was feeling, Ryan took Mr. McGill down to medical.

30.     At 12:23 p.m., Mr. McGill was seen by Tracy Haynes, LPN.

31.     Nurse Haynes set an appointment with a "mid level provider" for Mr. McGill based on "C/O increased dizziness and headaches.  Feels like it may be vertigo.  Please assess."

32.     Nurse Haynes designated this appointment as a priority level 1 (with 1 being the highest).

33.     After setting this appointment, Nurse Haynes and other medical staff told Mr. McGill that he was probably just dehydrated, instructing him to drink water.

34.     Mr. McGill was sent back to his "pod" and tried to rest until dinner.

35.     While trying to go to dinner, however, Mr. McGill was feeling dizzy and having trouble going down the stairs.  He was holding on to the rail with both hands when he slipped and missed the bottom step.

36.     Deputy Vowers came over and Mr. McGill told him that he was unable to balance himself.  Deputy Vowers then transported Mr. McGill to medical in a wheelchair.

37.     On September 17, 2012 at around 5:06 p.m., Matt Killough, PAC, saw Mr. McGill.

38.     Mr. Killough made the following chart entry: "44 y/o male presents to clinic c/o

6

intermittent dizziness with posterior HA and neck pain."

39.     P. A. Killough also noted that Mr. McGill was "currently in wheelchair and unable to walk to clinic."

40.     P.A. Killough tested Mr. McGill for benign paroxysmal positional vertigo, finding him to test negative.

41.     Despite such negative testing, P.A. Killough's assessment of Mr. McGill was that he either had "migraine associated vertigo" or benign paroxysmal positional vertigo. P.A. Killough made another mid level practitioner priority 1 level appointment for "f/u dizziness/vertigo."

42.     The classic warning signs for a brain stem stroke include vertigo and headache. Vertigo often hits well before the stroke occurs and causes people to feel unsteady, dizzy, and as though the room is tilting.

43.     During this exam, P.A. Killough also went back and forth between Mr. McGill and another room where there was a doctor.

44.     On information and belief this was Dr. Brill. Defendant Brill did not come into the room, despite the fact that Mr. McGill was brought in in a wheelchair complaining of severe vertigo.

45.     Although Dr. Brill did not physically evaluate Mr. McGill, he may have been involved with his care and treatment as his treating physician at this time, as a bed change from an upper bunk to a lower bunk on a lower floor in the jail was ordered.

46.     Mr. McGill's housing history report shows that he was moved from his upper bunk on a higher floor to "cave" MJ-4D-28 at 5:40 p.m.

47.     "Cave" is the term used for a group of beds within a "pod."

48.     He was having so much trouble balancing that two other inmates had to assist him in the housing move.

49.     At some point close after this move, there was a lock down for shift change and Deputy Powell came on duty.

50.     Mr. McGill and fellow inmate Gilbert Renteria told Deputy Powell that Mr. McGill needed help, and Deputy Powell responded that he needed to wait for a nurse that would be by shortly for med pass.

51.     While he was sitting in the common space, trying to watch the Broncos game, his symptoms dramatically escalated.

52.     He felt like his brain was stuck on something and he could not move his right side very well.

53.     Vance Goetz, another inmate, came over to him and saw that the right side of his face was plainly drooping and that his speech was slow and slurred.

54.     Mr. Goetz, who has had close family members with strokes, recognized the droop and stroke affect, and told Mr. McGill that he believed he was having a stroke based on these similar symptoms.

55.     As Deputy Powell had just told Mr. McGill to wait for medical, and having been to medical several times with no one taking him seriously, he decided to try calling his wife to help him obtain medical assistance.

56.     Mr. McGill had difficulty walking to the phone and Mr. Goetz had to assist him and then help him dial the numbers.

8

57.     At 8:36 p.m., Mr. McGill made a 15-minute call home to his wife.

58.     During this recorded call, Mr. McGill is clearly in a serious medical crisis and sounds tearful and terrified.

59.     On the call, Mr. McGill is crying and slurring his words and reports, *inter alia*:

  a.   "I think I had a stroke today";

  b.   "I keep telling them, they keep taking me downstairs and not doing anything";

  c.   "I can't feel anything [incomprehensible].  My whole right side is like numb. I can't talk.  You don't know how hard it is to even talk";

  d.    "Something is really wrong";

  e.   "Jen, I'm really just scared"; "It keeps getting worse and worse.  And I can't [incomprehensible] the whole right side of my body now.  And I can't even talk.  I'm scared to death."

60.     Mr. McGill's speech was very noticeably slurred, leading his wife to tell him repeatedly that she could not understand him.

61.     Ms. McCracken became increasingly upset and worried as she could hear her husband's slurred voice and obvious fear.

62.     Ms. McCracken didn't understand that Mr. McGill had been seen several times already by medical.

63.     Ms. McCracken, who had worked for a number of months as a guard in a prison, knew the only way to obtain urgent care is to go to the medical staff directly, which she urged him repeatedly to do.

64.     She told him that he had to get to the hospital immediately (noting that there is a

hospital very near the jail), and that it was plainly obvious to anyone that he needed urgent medical attention.

65.     Mr. McGill had such difficulty speaking and explaining himself that Mr. Goetz had to take the phone and explain to Ms. McCracken what was happening.

66.     Mr. Goetz reported to Ms. McCracken, *inter alia*:

    a.   "Something is wrong with him;"

    b.   "Something is definitely wrong.  His speech and he is having a hard time walking;"

    c.   "It's definitely his right side, I mean his whole right side.  He is slurring his words, and his mouth, when he talks, his right side is dragging, you know what I mean and when I just got him up out of his chair, his right side is not working that well."

67.     Mr. Goetz also told Ms. McCracken that he thought her husband was having a stroke.

68.     Around this time, Mr. Goetz went and told Deputy Powell that this was a serious medical crisis and Mr. McGill needed to go to medical immediately.

69.     Deputy Powell called over the radio to medical after seeing Mr. McGill tearful and in need of medical attention while on the phone.

70.     Nurse Daria Arthur was near the pod as she was doing med pass and Deputy Powell approached Mr. McGill, and helped him into a wheelchair.

71.     On the call, Mr. Goetz can be heard talking to a nurse and reporting: "I think he had a stroke." He further reports to the nurse: "it's his right side, the whole right side of his

10

body."

72.     Mr. McGill was brought back to medical and seen by the charge nurse, Gina Battenhouse, RN, sometime between 8:50 and 9:15pm.

73.     Mr. McGill specifically told Nurse Battenhouse that he thought he was having a stroke and asked to see a doctor and go to the hospital, only to have her callously and with deliberate indifference respond: "Are you a doctor?  Have you had a stroke before?  What do you know about strokes?"

74.     Nurse Battenhouse knew that other inmates were reporting Mr. McGill's sudden speech changes, that Mr. McGill was reporting one-sided numbness, and undoubtedly, she saw the same facial droop that both these other lay inmates reported.

75.     Sudden numbness or weakness of face, arm or leg, particularly if it is on one side of the body, sudden trouble walking or loss of balance or dizziness, sudden severe headache, and sudden speech changes are all well known individual emergency warning signs of a stroke and mandate an emergency call to 911 or transfer to the hospital.

76.     Despite the slurring, limited right side movement, and repeated statements about having a stroke evident on the call just minutes before this assessment, Nurse Battenhouse, recklessly and with deliberate indifference did not chart any of these obvious symptoms of a stroke medical crisis.

77.     Nurse Battenhouse merely charted the following: "I/D brought to medical with c/o dizziness/anxiety.  I/D brought in wheelchair … I/D states tingling feeling on right side."

78.     Nurse Battenhouse also did not chart that Mr. McGill's face was drooping.

79.     This Defendant falsely reported four times that his gait was normal and he could

walk around the room.

80.    Mr. McGill was not able to walk normally at this point, however, which was why he was brought in a wheelchair.

81.    These instances of false charting are irreconcilable with what is known to have been the true state of his condition and were done intentionally and/or recklessly.

82.    Medical staff consciously decided to ignore Mr. McGill's serious medical needs, complaints and known medical crisis and Nurse Battenhouse simply sent Mr. McGill back to his bed.

83.    When Mr. McGill tried to walk back to his pod, he faltered just outside the nursing station and Deputy Powell brought him a wheelchair.

84.    Deputy Powell then called Mr. McGill's wife and told her that Mr. McGill was fine, having been falsely told by the reckless Nurse Battenhouse that he was only having a panic attack.

85.    Deputy Powell also notes that: "McGill was on the dayroom phone tonight with his wife when another I/D informed me that McGill was talking funny and acting strange… Nurse Daria spoke with McGill and decided that he needed to be seen by the charge nurse in medical … Gina believed it was high anxiety which caused him to hyperventilate and for his right side to feel numb."

86.    Mr. McGill was returned to his new "cave" preparing for lock down.

87.    Mr. McGill did not sleep, as is falsely claimed in the records, but attempted to lie down and see if rest would help with anything, having been told that he could not see a doctor or get higher-level medical assessment.

88.     While he was sitting in his new bed, another inmate, Mike Moore, entered the "cave."

89.     Mr. Moore had previously worked as a paramedic.  He asked Mr. McGill to smile and saw that only the left side of Mr. McGill's face moved normally.  He saw drool coming from Mr. McGill's right side of his mouth.

90.     He asked Mr. McGill to try squeezing his hands and noted that his grips were unequal.  He witnessed Mr. McGill having trouble ambulating and that he was having right-sided weakness.

91.     Mr. Moore told Mr. McGill that he was "watching him have a stroke."

92.     Mr. Moore convinced Deputy Powell to send a nurse to the "cave."

93.     Nurse Daria Arthur came and assessed Mr. McGill.  "Can't you see that he is displaying all of the signs of a stroke?" Mr. Moore asked the nurse. She callously responded something to the effect of "I'm just here to give him an ibuprofen."

94.     She performed no assessment of her own at that time.

95.     Mr. Moore had to assist Mr. McGill to the toilet due to his inability to control his bladder during this crisis.

96.     Mr. Moore continued to advocate for Mr. McGill, only to be threatened to mind his own business or be subject to jail sanctions.  Deputy Powell had also told Mr. Renteria and others to stop "working [Mr. McGill] up."

97.     Mr. McGill continued to decline. At one point Mr. Renteria approached Deputy Powell and said "you guys are screwing this up, he is having a stroke right now."  Mr. Moore also repeatedly entreated Deputy Powell to help Mr. McGill.

13

98.     Concerned and persistent inmates finally convinced Deputy Powell to take him back to medical. This was near midnight.

99.     Thus, at 11:54, Rachael Conner, LPN reports that Mr. McGill "tearfully" told her "it feels like my whole R side is dead." She also reports that he told her: "I just want to see a Dr.; I need to go to the hospital."

100.    Nurse Conner recorded these desperate pleas for help, noted that he had "guarded gait" and "slowed" speech and negligently and with deliberate indifference to his serious medical needs, still did not call for emergency help.

101.    When Mr. McGill had to go to the bathroom while in medical and couldn't ambulate himself, Nurse Conner said to him "we know you can do it, we aren't here to take you to the bathroom."

102.    When he told her that he couldn't swallow and that he couldn't hold the cup, Nurse Conner ignored this additional serious symptom, did not call a doctor to report swallowing difficulties, and instead dumped out the liquid and told him to eat the sugary part at the bottom.

103.    At 1:18 am, Defendant Battenhouse notes that Mr. McGill will be sent back to his pod soon, but then suddenly changes her mind, without any explanation in the record of her observations or reasoning for the change, stating instead at 1:59 am that Mr. McGill "will be housed in SHU for OBS until seen by Dr. for safety."  She also falsely stated that he would be given a "boat" on the floor.

104.    A "boat" is a device which has a mattress for the resident to sleep on when he can't get into a bunk or when the other bed is full.

105.    In this same note, Defendant Battenhouse acknowledges the complaint of right-

sided issues, but again fails to chart Mr. McGill's complaints and signs of stroke, instead noting "No hx of stroke or TIA."

106.    The SHU is also called the "hole" and is where inmates are put as punishment for various offenses.

107.    The SHU room into which Mr. McGill was placed had one mattress bed, which was occupied by another resident.

108.    He was never given a boat or mattress.  He was intentionally and punitively left to lay on the concrete floor of the special housing unit, thinking he was dying – for almost seven hours.

109.    Mr. McGill started yelling that he needed help, that he was dying, that he needed a doctor, but the deputy and Nurse Battenhouse both became angry with him and cruelly instructed him to "shut up."

110.    Nurse Battenhouse noted at 5:42 am, again falsely, that Mr. McGill was sleeping and that he was able to eat his breakfast.  Mr. McGill did not sleep and was unable to swallow liquid or food.

111.    Mr. McGill reported to her that he could not swallow.

112.    Nurse Battenhouse does finally note "I/D weak on right side" but then deliberately falsely stated "swallowing just fine" and "able to ambulate."

113.    Mr. McGill heard a deputy say that there would be lock down for a shift change. Knowing that Nurse Battenhouse would finally go off duty and a new nurse would be in, Mr. McGill spent an hour crawling across the floor to ring the bell for help.

114.    While the progressing stroke destroyed more of his brain, he was abandoned on

the hard floor, believing he was dying.

115.    His fellow inmate in the SHU (name currently unknown) told him not to ask for help, that he was going to get them in trouble, and said to him "don't die with me in here."

116.    It wasn't until this shift change that Mr. McGill's statements that he is having a stroke, which he was making since at least 8:30 the night before, are finally noted in the record for the first time.

117.    Thus Nurse Guthrie states: "Patient is found standing in cell at door.  The patient is tearful and states that he believes he is having a stroke."

118.    Nurse Guthrie assessed Mr. McGill, noting that his grips were not equal.  She then states that the patient refuses to cooperate with the exam to assess for "facial palsy" when in fact he was simply unable to perform the tests she requested of him. She further notes that she gave him a "teaspoon of water and handles it well without coughing."

119.    Mr. McGill did not refuse to cooperate with the exam.

120.    This teaspoon of water test was performed because Mr. McGill was complaining that he could not swallow normally.

121.    Mr. McGill was unable to swallow and actually told her "it feels like my face is in my lap."

122.    Also during this 7:38 visit with Nurse Guthrie, she noted that his blood pressure had spiked considerably from his baseline to 154/100.  This is a very high blood pressure for Mr. McGill with his baseline being much closer to 120-30/80.

123.    The lack of perfusion was now actively destroying Mr. McGill's brain tissue.  He had yet *another* nurse who knew about his weakness, his slurred speech, his perception that he

was having a stroke, his swallowing problems, his intense fear, and his facial droop but with deliberate indifference still no emergent care was arranged.

124.    Nurse Guthrie did finally call Dr. Brill.

125.    Mr. McGill was moved to the assessment cell to be seen by Dr. Brill, who did not see him for over an hour after the call from Nurse Guthrie, around 9:00 a.m.

126.    Dr. Brill reports that Mr. McGill is complaining of "difficulty moving right side and difficulty with speech."

127.    Dr. Brill then goes on to synopsize Mr. McGill's recent complaints stating: "yesterday noted dizziness … later noted posterior headache, difficulty with depth perception, then reported right sided weakness, had fall in hall way and was put in SHU o/n, Multiple RN and PA and other assessments without conclusion.  This am ID is complaining of difficulty with speech, and right sided weakness, right arm more weak than right leg."

128.    Dr. Brill reports in the objective portion of his notes that Mr. McGill is "tearful" and "frightened" and that he is "not moving right arm spontaneously and slurring speech."

129.    He finds "Right central facial weakness, weak right shoulder shrug and turn of head to right.  Weak right arm with pronator drift, left leg is weak but not as weak as the arm."[1]

130.    At this point, instead of emergently transporting Mr. McGill, he called in nursing staff in front of Mr. McGill and yelled at them for ignoring an obvious stroke.

131.    Dr. Brill picked up his arm and said, "look at his arm, look how it is drifting."

132.    Nurse Guthrie sees Mr. McGill right before this assessment by Dr. Brill and "patient ambulated to bathroom in exam room with out difficulty and unassisted."

---

[1] This is believed to be a typo by Dr. Brill, it was Mr. McGill's right leg, not his left leg.

133.    She sees him again right after Dr. Brill concluded that he was having a stroke and she again notes "[p]atient ambulated to restroom without assistance and no concerns were voiced."

134.    At 9:45 a.m., Dr. Brill orders outside evaluation for an MRI.

135.    Dr. Brill inappropriately arranged for an outpatient MRI rather than for an emergent CT scan.

136.    Dr. Brill knew this was a stroke, and yet negligently and with deliberate indifference failed to make STAT orders or call an ambulance.  He either also failed to communicate the emergency nature of his findings to jail staff, or jail staff didn't care and Mr. McGill was thus left to languish for hours more.

137.    It took deputies significant time to get him into and out of the van in his debilitated condition.

138.    Deputies handcuffed and shackled Mr. McGill while driving him to the hospital.

139.    Because he was basically paralyzed on his right side, he could not sit up and fell and slid across the van during turns.

140.    The deputies cruelly laughed at him.

141.    One female deputy said to him something along the lines of: "you can stop pretending, you are getting what you wanted."

142.    Deputies took Mr. McGill to the out-patient area at Lutheran, increasing even further the delay in getting emergent treatment.

143.    Mr. McGill should have been taken directly to the hospital in an ambulance.

144.    At 1:00 p.m. Lutheran medical staff called Dr. Brill to discuss the findings of the

MRI study, which revealed an "acute left pontine infarct."

145.    An infarct is an area of dead tissue caused by lack of oxygen to the area.

146.    Mr. McGill had an ischemic stroke, which caused a lack of blood flow to his brain causing a large infarct.

147.    In a disturbing late charting and/or deliberately false charting entry, 36 minutes later P. A. Matthew Killough made an "addendum" to his previous notes regarding Mr. McGill. He now notes "Pt speaking normally during exam.   Grips equal during exam, reflexes symmetrical."

148.    Clearly, if Mr. Killough had evaluated Mr. McGill's grip strength or reflexes that should have been charted at the time the patient was seen.

149.    This is post hoc defensive charting by a medical professional and may well be evidence of a cover-up.

150.    Finally at Lutheran outpatient, the MRI indicated a stroke and Mr. McGill was carted over to the emergency room, went through intake and, well over sixteen hours after the likely beginning of his first stroke and at least six hours after his spike in blood pressure and further worsening of symptoms, Mr. McGill was hospitalized.

151.    By this point, it was too late for Mr. McGill to have serious intervention for his stroke as far too much of his tissue had been allowed to die.

152.    While Mr. McGill was in the hospital, Mr. McGill's mental function was moving very slowly.   He was unable to give a full history and deputies spoke for him, providing incomplete and inaccurate histories.

153.    Deputies then refused to allow him to communicate with his wife and refused to

19

communicate with his wife for him.   He was thus denied access to proxy medical decision makers during this critical time.

154.    On information and belief, deputies told Lutheran Hospital that Mr. McGill was a Do No Resuscitate code status, and this was put into the computer system about Mr. McGill.

155.    This means that Mr. McGill, who was unable to communicate clearly, and who had been denied his proxy emergency medical decision maker wife, was listed as DNR and would have been allowed to die without intervention had further crisis occur.

156.    Ms. McCracken, having been told by Deputy Powell that Mr. McGill was fine the night before, went by the jail to see him the next day.

157.    When she arrived at the jail she was told that he was no longer there, that he had been sent to the hospital, but that it "wasn't an emergency" or she would have been notified.

158.    Jail staff told her it was "against policy" to inform her about her husband's medical care, even though she is his wife and listed emergency contact.   They told her that this would violate security protocols.

159.    Ms. McCracken, and Mr. McGill's mother, Joanne McGill, spent the next few days calling hospitals and even wandering through hospitals desperately trying to find Mr. McGill.   They were unable to obtain any information from law enforcement or medical staff despite repeated requests, which were purposely ignored.

160.    Ms. McCracken was repeatedly told by jail staff that "policy" required that he fill out an authorization form before they could tell her anything, while they also refused to present him with such a form.

161.    Mr. McGill was also asking at the same time for whatever forms he needed to be

able to inform his wife so she could be there and help him make medical decisions during this crisis.

162.    On information and belief, individual deputies were specifically prevented from presenting Mr. McGill with this form.

163.    For days Ms. McCracken was kept from knowing any information about her husband.

164.    A few days into the stay at Lutheran, Mr. McGill was allowed to use a phone to try to order his meal as an aspect of physical therapy, practicing regaining his speech.

165.    He instead used the phone to call Ms. McCracken and tell her where he was.

166.    She immediately came to the hospital.

167.    They were able to visit only for a few minutes before the deputy told her she had to leave.

168.    Mr. McGill was transferred the next day to Boulder Community Hospital, again with no information given to Ms. McCracken, further intentionally interfering with this marital relationship.

169.    She spent the week calling and wandering through stroke units looking for Mr. McGill.

170.    It did not occur to her that Jefferson County could move him out of the Denver Metro area and so she was not able to find her husband.

171.    Mr. McGill asked several times every shift for a release of information form so he could authorize his wife to know where he was and to try to be able to talk to her.

172.    He was also repeatedly told by the deputies that he was not allowed to call his

family from the hospital.

173.    It was at Boulder that Mr. McGill learned he was listed as a DNR.  A nurse came to him and said: "do you really want to die?"

174.    Mr. McGill had been fighting for his life.  He wanted to live.  He needed the ability to speak for himself or to be in contact with people who loved him to help him communicate medical decisions.

175.    Mr. McGill threatened to check himself out against medical advice, because then he would be taken back to the jail where he could at least call his family.

176.    Only upon the threat of having to take a dependent and disabled man back to jail, where they knew they couldn't care for his now advanced needs, did upper level jail staff relent in their purposeful interference with this family relationship.

177.    Mr. McGill was given a phone and called his wife, who he had not spoken to since he left Lutheran.

178.    After Ms. McCracken informed the Court what was happening, the Court Ordered Mr. McGill released from jail.

179.    Mr. McGill is now over a year from this 24-hour nightmare and his entire universe is different.

180.    He still suffers from some right-sided paralysis.  He walks very slowly.  He has difficulty with speech and speaks very slowly.

181.    Mr. McGill's right hand and grip are severely compromised.

182.    Writing is difficult.

183.    His rotator cuff on his right side is damaged; he has significant trouble lifting his

right arm.

184.    His right hip and hamstring are difficult for him to use and walking is much more difficult.  He has had to relearn a gait and it makes him walk much more slowly.

185.    His vestibular nerves have been affected and he is constantly dizzy. He always feels like the room is spinning, like he is going to fall over.  Because of this dizziness, Mr. McGill has to wear a neck patch to try to help with these symptoms.

186.    This patch also has a host of side effects, including constant irritation of his skin, callousing, pain, and significant discomfort.  Without the patch, Mr. McGill is so dizzy he can hardly walk.

187.    He has participated in extensive rehabilitation and hopes for further improvement, but he has been told by his treating physician and other medical professionals that his recovery has hit a plateau and it is expected he will have these persisting symptoms for the rest of his life.

188.    He has been told he will never return to his work.

189.    To a reasonable degree of medical certainty, these negligent and deliberately indifferent delays prevented Mr. McGill from having a full recovery.

190.    Mr. McGill's doctor believes that it very medically probable he would have been able to return to work and would not have suffered the debilitating dizziness and motor issues that he currently suffers, had he not been abandoned in this clear medical crisis.

191.    The involved care givers acted in concert in this dereliction of duty.

192.    As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff has been substantially injured. These injuries include, but are not limited to, loss of constitutional rights, physical injuries, impairments and disfigurement, great pain and

23

emotional distress, anxiety, shock, sadness, depression, anger, stress, and special damages for medically related treatment caused by the unconstitutional, negligent, and atrocious conduct of these Defendants.

193.    Mr. McGill has significant physical, economic, and emotional damages as a result of his suffering and not being timely treated for his stroke.

194.    As a direct and proximate result, Mr. McGill also has substantially impaired earnings capacity, substantial and ongoing lost past and future earnings in amounts that will be proven and fully ascertained at trial.  He worked as a contracting estimator for over 15 years.  He is no longer able to work and will likely not be able to work again.  He has lost substantial annual income and benefits and his full economic loss is not yet ascertained.

195.    Mr. McGill also suffers severe emotional distress as a result of these events, including their ongoing sequelae.

196.    These events have had a significant impact on Mr. McGill's relationship with his wife, significantly interfering with intimacy and turning their relationship from that of a husband and wife into one more like that of a caregiver and patient.

197.    During the time Ms. McCracken was unable to find or contact her husband, Mr. McGill suffered emotional distress, upset, anxiety, and worry.  Mr. McGill was also without the aid of a proxy medical decision maker.

198.    Defendants' conduct was engaged in with malice or with reckless indifference to the federally protected rights of Plaintiff, entitling him to punitive damages.

### Additional Allegations Related to Entity Liability

199.    CHC and County Defendants maintain unconstitutional policies and customs

regarding stroke protocol and providing emergency and/or higher level care in a timely manner.

200.    The Health Care Services Contract in place was "made and entered into by and between the **COUNTY OF JEFFERSON, STATE OF COLORADO**, a body politic and corporate (the "County"), for the use and benefit of the **JEFFERSON COUNTY SHERIFF** (the "Sheriff") and Correctional Healthcare Management, Inc." (Emphasis in the original).

201.    This contract financially incentivizes reductions in the use of necessary emergency medical services for inmates, and as such, represents an unconstitutional policy which gives rise to entity liability.

202.    Under the express joint agreement between CHC and County Defendants, CHC is contractually obligated to pay the first $50,000 of hospital care "for any one inmate."

203.    The relevant provision, Paragraph D, states as follows:

The Contractor's maximum liability for costs associated with off-site provision of medical or other health care services for any one inmate during any Contract term from date of first service under this Contract will be Fifty Thousand Dollars ($50,000). Any expenses incurred or to be incurred for medical and other health care services provided off-site (e.g. hospital, specialist) in excess of that amount will be the responsibility of the County. The Contractor shall notify the County when costs for any Inmate in one year exceed $40,000 or threaten to exceed the $50,000 per year per Inmate threshold.

204.    Paragraph D invites reckless risk taking to save money – it expressly offers a $50,000 incentive, per inmate, to disregard known and excessive risks to an inmates' health or safety – including the risk that they may die or suffer.  Such overt incentivizing of denial and delay of treatment amounts to deliberate indifference.

25

205.     In addition to the express policies in place, CHC and County Defendants failed to adequately train and supervise its nursing staff, amounting to deliberate indifference to the serious medical needs of inmates presenting with stroke like symptoms.

206.     They are deliberately indifferently trained not to treat stroke like symptoms as an emergency and, instead, to adopt a reckless wait and see approach without meaninful or appropriate evaluation.

207.     Staff are deliberately indifferently trained and allowed to follow a custom of disregarding history given by patients as being faked to get out of jail.

208.     Time is of the essence in a stroke and it is deliberately indifferent to adopt such a wait and see approach when a patient presents with stroke symptoms, as such a patient must be quickly evaluated by the appropriate level provider such as a neurologist.

209.     This reckless wait and see approach is informed by the general widespread protocol of assuming that prisoners are faking their illnesses.

210.     Mr. McGill was kept in the medical unit while his stroke killed portions of his brain under this reckless approach.

211.     On at least one occasion, Rachel Conner was instructed by the then doctor, now chief medical officer, Dr. Herr, to maintain a patient exhibiting stroke symptoms such as slurred speech and high blood pressure in the medical unti rather than transfer that person for urgent appropriate evalution.

212.     It is her training and experience at CHC and JCDF that stroke symptoms, such as slurred speech, headache and one sided problems are not emergencies requiring transportation,

but rather should be evaluated overnight based on CHC and JCDF policies, training and procedures.

213.    Matt Killough, PAC for CHC and JCDF, testified that it was consistent with training and policies at CHC and JCDF not to treat such symptoms as emergencies but rather to wait and keep the patient in the medical unit rather than transfer for appropriate urgent evaluation.

214.    This is so far outside of the standard of care for medical professionals as to be obviously reckless to a lay person and deliberately indifferent to the known serious medical needs of inmates presenting with stroke symptoms.

215.    The training and procedures of JCDF and CHC with respect to stroke symptoms and not treating such symptoms as emergencies requiring higher level evaluation is deliberately indifferent to the known serious medical needs of inmates presenting with stroke like symptoms.

216.    A motivating factor in this reckless wait and see approach is the financial impact of hospitalization on CHC directly.

217.    CHC and JCDF have no stroke protocol, which is also deliberately indifferent.

218.    CHC and JCDF have instituted financial incentives against hospitalizing patients and institutionalize this by creating a structure where the Charge Nurse or higher has to approve the decision to send someone out to the hospital.

219.    There is also a custom of not sending people to the hospital or arranging for expensive care, regardless of who pays, and that cost drives medical decisions rather than need.

220.    There are also at least seven or eight other inmates known at this time who claim to recently have been denied expensive and needed care (specifically including refusal of urgent

transfer for chest pain resulting in a heart attack and significant delay before an ordered orthopedic surgery) by CHC and Jefferson County related Defendants.

221.   Further, CHC is a national company, who, according to their own website, employs over 2,500 individuals, manages healthcare to over 70,000 inmates on a daily basis, and services facilities in 27 states.

222.   Reviews by CHC employees online have made statements like: "Very poor experience with management who had little knowledge and asked for mediocrity in the care to be provided justifying they 'have really good lawyers,'" "and "Money is all they care about. Don't do what they are contracted to do. Will lie to you. The inmates are the ones who suffer. Staff are not respected and they don't care about you. Just look at all of the lawsuits in federal court."

223.   There is a surfeit of evidence nationwide that these private healthcare companies and the counties that employ them are deliberately indifferent in their polices and training, customs and habit at a high level.   This deliberate indifference was a moving force in these injuries.

224.   In *Rivella v. Stanley Ganz, Sheriff of Tulsa County, et al*, a multiple plaintiff case was filed against Correctional Health care related companies arising out of several deaths[2] and one near death resulting from inadequate medical care and refusals to obtain needed outpatient and emergent services for prisoners. It was alleged that "[t]here is a longstanding policy, practice

---

[2] Mr. Brown is alleged to have died of bowel perforation and sepsis after medical staff refused to transport him to the hospital despite escalating and serious symptoms for about a week.  Ms. Salgado is alleged to have died of a heart attack after complaints of chest pain were ignored for days without emergency transport.  It is alleged that she had been dead for at least 4-6 hours, as evidenced by rigor mortis when staff began CPR, which emergency technicians continued only out of an alleged attempt to have her declared dead outside the jail and thereby avoid an investigation related to a jail death.  Ms. Young, who had a known history of cardiovascular problems, died after complaints of pain, nausea and vomiting were ignored and emergency transportation denied.

or custom at the Jail of CHC/CHM/CHMO and TCSO [the jail] refusing to send inmates with emergent needs to the hospital for purely financial purposes … There is a well-established policy, practice, and/or custom of understaffing the Jail's medical unit."

225.    According to the *Rivella* and *Layton* cases, CHC related entities have had the following high level reports of their constitutional deficiencies:

    a.    In 2007, the National Commission on Correctional Health Care ("NCCHC") auditors reported serious and systemic deficiencies in the care provided to prisoners by CHC related companies in the Tulsa jail, including failure to triage sick calls and failure to address health needs in a timely manner;

    b.    In 2008, the Department of Justice found that the jail medical program, administered by a CHC related entity, was constitutionally deficient in a number of regards. Specifically DOJ found problems in "providing appropriate access to medical care during emergencies" citing a case where a woman went into premature labor and delivered a baby while handcuffed to a chair rail, after all her complaints, including that her water had broken, were ignored. The DOJ found that there were "critical lapses in getting emergency medical care to detainees." DOJ also noted that they had conducted a previous tour in 2003 and that, despite many years to remedy the violations found, "we generally did not observe improved conditions at the time of the second tour."

    c.    In 2009, an Oklahoma Department of Health investigation indicated that such deficiencies continued unabated by CHC related companies despite the abundant notice of the same from NCCHC and DOJ.

    d.    In 2010, NCCHC performed another audit. The *Rivella* case alleges that during the NCCHC audit process, which resulted in probation for the program, high-level employees of CHC attempted to fraudulently change medical records to give the appearance of compliance. NCCHC found deficient care, deficient investigation into deaths, and lack of timely diagnostic and specialty services. Even after this audit, *Rivella* alleges that CHC had no intention of actually following the corrective action plans, and did not take the corrective measures necessary to alleviate the obvious and substantial risks to inmate health identified. *Rivella* further alleges that high-level CHC workers repeatedly brought to corporate CHC attention the many serious deficiencies, including chronic failures to triage medical requests, falsification of records, and refusals to treat inmates with life-threatening conditions, but that the corporation refused to make any changes to the way CHC related companies do business.

e. In November 2011, the jail's own retained auditor allegedly found the same deficiencies in care. This company is alleged to have abundantly demonstrated its callousness toward the serious medical needs of prisoners, its active knowledge from reputable sources that its operating procedures are glaringly indifferent, especially with respect to timely care for the seriously ill prisoners and have chosen again and again not to implement changes to provide adequate care to prisoners in their jails.

f. In 2011, U.S. Immigration and Customs Enforcement and the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") also conducted a review of the medical care provided by CHC and related companies and reported that: ***"CRCL found a prevailing attitude among clinic staff of indifference...."***; "*Nurses are undertrained*. Not documenting or evaluating patients properly." (Emphasis supplied).

226. Following the death of inmate Earl Williams in October 2011, his estate brought suit against Correctional Healthcare related companies after he was videotaped for *days without food or water dying*. Deputies threw food at Mr. Williams and put water just outside his reach saying that he was faking his paralysis. His shocking death in a medical 'observation room' was actually videotaped.

227. That lawsuit similarly alleged inter alia, that CHC related defendants "have maintained a policy, practice, and/or custom of severely limited the use of off-site medical, mental health and diagnostic service providers, even in emergent situations, in disregard to the known, obvious and excessive risks to the health and safety of inmates."

228. That case also alleged that this deliberate indifference is "due to the fact that, per contract, CHMO/CHC/CHM is limited to a capped aggregate amount of $600,000 per contract, per year, for costs associated with the provision of off-site medical or other health care services." These allegations were made against CHC entities before the conduct complained of in this matter putting these defendants on notice of this financial incentive problem prior to the injuries

in this case.

229.    CHC's corporate headquarters is in Denver, Colorado and, on information and belief, the Tulsa jail medical care and policies and practices are overseen by the same high level corporate employees as oversee the JCDF program.

230.    Evidencing this pattern and practice of not transporting patients for out patient care, in November, 2010, Robert Turley filed a civil rights complaint against Sheriff Mink, and two health care providers.  One of those providers, Matthew Killough, is employed by CHC related Defendants and saw Mr. McGill in this matter.  In that case, the plaintiff choked on some food, complained of sharp pain and threw up blood.  He asked to see a doctor and to be transported to the hospital.  The request was denied and he, like Mr. McGill, was instead placed in the Special Housing Unit and warehoused until he was found hypoxic and unconscious.  He was given an epipen and taken to the hospital by paramedics where he was found to have a perforated esophagus requiring surgery.

231.    In that case, CHC related entities actually paid much more than the $50,000 incentive contained in the contract.

232.    For Mr. Turley's medical care, CHC related entities, through Correctional Health Partners, negotiated a discount from the billed amount of $222,518.92 and paid almost $180,000 themselves.

233.    Whether there is an additional contract requiring Correctional Health Partners to pay the rest of the care above the $50,000 is unknown.  In either case there are heavy financial incentives for CHC related workers not to transfer patients from JCDF to outside facilities.

234.    County Defendants, in conducting any type of due diligence in contracting with

CHC related companies to provide medical care in Jefferson County Detention Facility, would have known of these serious issues in licensure and accreditation of CHC related prison programs and the multiple findings of multiple governmental agencies and refusals by CHC to correct glaring deliberately indifferent policies and therefore are liable for the selection of this company.

235.    Defendants had all of the above-described knowledge and notice prior to Mr. McGill's deliberately indifferent treatment and injuries, which were the result of longstanding, systemic deficiencies in the medical care provided to inmates by Correctional Healthcare and the result of the widespread company problem to refuse to send inmates with emergent needs to the hospital for purely financial purposes.

236.    Finally, CHC and County Defendants ratified the constitutional violation by individual Defendants by consciously deciding to not discipline, re-train or even hold any peer review meetings to discuss this utter failure in care.

237.    CHC and County Defendants also have deliberately indifferent practices, protocols and policies regarding the notification of emergency contacts and immediate family members regarding medical emergencies and medical status of their inmates, including protocols and policies that don't allow even proxy health decision makers to know of the whereabouts of inmates.

238.    Final decision makers and delegated final decision makers intentionally determined in this case not to allow Ms. McCracken to know what had happened to her husband or where he was, pretending that they did not have the notification forms they required when in fact Ms. McCracken was listed as the person to be notified within JCDF's system.

## V.   CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Eighth Amendment Prohibition Against Cruel and Unusual Punishment**
(Plaintiff McGill against Individual CHC Defendants)

239.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

240.   42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

241.   Plaintiff is a citizen of the United States and all of the Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

242.   Plaintiff had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs.

243.   All individual Defendants to this claim, at all times relevant hereto, were acting under the color of state law.

244.   Individual Defendants as willful participants in a joint activity actually knew of Mr. McGill's onset of stroke symptoms and deteriorating condition and nonetheless, with deliberate indifference, decided not to chart the symptoms and provide him with or secure for him obviously necessary urgent medical care.  They did so despite being expressly aware of Plaintiff's known serious medical needs and recklessly disregarding a substantial risk of physical harm to Plaintiff.

33

245.     Individual Defendants continued to act in bad faith and with deliberate indifference to Plaintiff's serious medical needs and constitutional rights when they willfully ignored his repeated requests for medical attention and intentionally denied and/or delayed his access to medical care.

246.     Individual Defendants are not entitled to qualified immunity.

247.     Each of the individual Defendants is liable to the Plaintiff for violation of 42 U.S.C. § 1983.

248.     Defendants were willful participants in a joint activity.

249.     The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of his constitutional rights and were moving forces and substantial significant contributing proximate causes of Plaintiff's injuries.

250.     As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling him to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

251.     As a further result of the Defendants' unlawful conduct, Plaintiff has incurred significant special damages, including medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

252.     Plaintiff has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

253.     Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

254.     Plaintiff is entitled to punitive damages against each of the individually named

Defendants under 42 U.S.C. § 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Eighth Amendment Prohibition Against Cruel and Unusual Punishment**
(Plaintiff McGill against Jefferson County Defendants and CHC Defendants)

255.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

256.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

257.    Plaintiff is a citizen of the United States and the Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

258.    Plaintiff had a clearly established right under the Eighth Amendment to be free from deliberate indifference to his known serious medical needs.

259.    CHC Defendants to this claim, at all times relevant hereto, were acting under the color of state law, as the functional equivalent of a municipality providing medical care to inmates.

260.    Jefferson County Defendants, at all times relevant hereto, were acting under the color of state law and had a non-delegable duty to provide constitutionally adequate medical care for inmates.

261.    The County is also directly liable for its own policies that are moving forces in this constitutional injury under the contract between Jefferson County and private Defendants, as the County was the entity that participated in negotiating and sponsoring this contract with its financial incentives for non-hospitalization of prisoners that is inconsistent with contemporary standards of decency.

262.    Jefferson County Defendants and the CHC Defendants are sued herein for their deliberately indifferent policies, practices, habits, customs and widespread usages with respect to the serious medical needs of inmates like this Plaintiff, and for their deliberately indifferent failures in training and supervising its employees, including individual Defendants.

263.    The contract between CHC and County Defendants constitutes a policy for § 1983 analysis as it reflects a written understanding for a fixed plan to provide medical care for all inmates at Jefferson County.

264.    The policy decision to financially incentivize deliberate indifference to known risks of serious injuries or illnesses violates the County's constitutional obligation to provide medical care under the Eighth Amendment.

265.    Jefferson County Defendants and the CHC Defendants deliberately indifferent failures to train, supervise, or create coherent relevant policies, are all actionable policy decisions and moving forces and substantial significantly contributing proximate causes of the violation of Mr. McGill's constitutional rights.

266.    Defendants were on general notice that its deliberately indifferent policies, which include those incentivizing not providing hospital care, would result or had resulted in a pattern of not sending inmates with serious medical needs to obtain necessary emergency services.

267.    Further, the failures in training, supervision and policy regarding stroke protocol and referring care to a higher level of acuity was so obvious that the failure to provide the same was deliberately indifferent to the rights of the relevant public, and a moving force in the complained of injury.

268.    Defendants, through policymakers and final delegated decision-makers, ratified the employees and subordinates unconstitutional conduct by approving their decisions and the basis for it.

269.    Defendants were willful participants in a joint activity.

270.    Further, by their complained of series and pattern of intentional actions and inactions, *de facto* policies, customs, habits, usages, and delegated final decision makers' decisions, these Defendants acted or failed to act in bad faith and with deliberate indifference to the obvious serious medical needs of patients and inmates.

271.    On information and belief, these Defendants knew that potentially serious or fatal consequences could be suffered by such individuals (including Mr. McGill) by their challenged policies and practices and by their failures to properly train and supervise medical care and/or develop adequate policies.

272.    Defendants' policies, including the financial incentive provision of the contract, were moving forces in individual Defendants and other staffs' repeated decisions to deny and delay treatment and hospitalization of Plaintiff during a medical crisis.

273.    Defendants' deliberately indifferent training were also moving forces in Plaintiff's injuries.

274.    As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries,

damages and losses as described herein entitling him to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

275.    As a further result of the Defendants' unlawful conduct, Plaintiff has incurred special damages, including significant medically related expenses and will continue to incur further medically related expenses in amounts to be established at trial.

276.    Plaintiff also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

277.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

278.    Plaintiff also seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress Defendants' ongoing deliberate indifference in policies, training and supervision with respect to the serious medical needs of patients and inmates in violation of the Eighth Amendment of the Constitution.

### THIRD CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Fourteenth Amendment Due Process Right to Familial Association
(Plaintiff against Jefferson County Defendants and CHC Defendants)

279.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

280.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

38

281.    Plaintiff is a citizen of the United States and the Defendants are persons for purposes of 42 U.S.C. § 1983.

282.    Plaintiff had a clearly established right under the Fourteenth Amendment to familial association.

283.    CHC Defendants to this claim, at all times relevant hereto, were acting under the color of state law, as the functional equivalent of a municipality in this context.

284.    Jefferson County Defendant, at all times relevant hereto, was acting under the color of state law.

285.    Jefferson County Defendants and the CHC Defendants are sued herein for their deliberately indifferent policies, training, practices, habits, customs and widespread usages with respect to rights of inmates with serious medical needs to have intimate family members be notified, and participate in their care, particularly when they are unable to do so for themselves and when such family members are the emergency contact, next of kin, and/or health care proxies.

286.    As a result of Defendants' deliberately indifferent policies, Plaintiff McGill was intentionally and specifically denied contact and access to his medical decision maker proxy while he was in a medical crisis.

287.    Defendants were willful participants in a joint activity.

288.    Plaintiff and Ms. McCracken made many attempts to follow procedures to obtain contact.

289.    Defendants' staff repeatedly cited the jail "policies" as the reason for preventing

any contact including, telling Ms. McCracken over and over by jail and medical staff that policy would not allow her to know where he was, that policy would not allow him to contact her, that policy prevented her from coming to make medical decisions, that policy prevented her from receiving updates about his condition, that policy prevented him from calling her as long as he was in the hospital as opposed to the jail.

290.    Ms. McCracken was not allowed to know where her husband was or if he was even alive for days and staff intentionally refused to provide Mr. McGill with authorization forms.

291.    Defendants' intentionally misled Ms. McCracken, in that, *inter alia*, Ms. McCracken was mislead by jail and medical staff that Mr. McGill was not in a medical crises, then told that he was hospitalized but that it was not an emergency, and then twice not informed where her husband was taken.  Jail and medical staff intentionally refused to allow Mr. McGill to execute a release such that this wife could be present with him in the hospital or know what was going on, depriving them both of familial relations and Mr. McGill of a proxy medical decision maker.

292.    Based on statements of Defendants' agents and this course of events, Plaintiff alleges deliberately indifferent policies that family members cannot know the location of a prisoner when he or she is out of the jail, a policy that a prisoner who has already listed a family member as an emergency contact must fill out another authorization form before that emergency contact can be contacted, regardless of their condition or ability to do so, and that there is a policy that prevents medical decision makers from participating in care and instead allows deputies with no information to provide background and make medical decisions for

incapacitated prisoners.

293.    These policies were moving forces in Mr. McGill and Ms. McCracken not being allowed access to each other, and in Mr. McGill being listed as "do not resuscitate" patient with no insurance.

294.    By their complained of series and pattern of intentional actions, *de facto* policies, customs, habits, usages, and decisions, these Defendants acted with the intent to interfere in the spousal relationship of Plaintiff McGill and his wife, protected by their clearly established right to freedom of intimate association.

295.    Defendants' policies, customs, delegated final decision makers' decisions, practices and/or deliberately indifferent failures to supervise or train were also moving forces and substantial significant contributing proximate causes of the violation of Plaintiff's rights.

296.    As a direct result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages and losses as described herein entitling them to compensatory and special damages including attorneys' fees in amounts to be determined at trial.

297.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

298.    Plaintiff also seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to redress Defendants' ongoing deliberate indifference in policies, training and supervision with respect to the needs of patients and inmates who are receiving care for their serious medical needs to have access to their intimate family members for participation and input in their care when they are the emergency contact person in their medical records, or next of kin.

## FOURTH CLAIM FOR RELIEF
### Negligence
(Plaintiff against CHC Defendants and Dr. Brill)

299.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

300.    CHC Defendants are private corporations that contract to provide medical care and health services to inmates at Jefferson County Detention Facility.

301.    The individual Defendants are also private individuals, not public officials.

302.    Defendants to this claim are properly sued for state law negligence as they are private corporations and therefore are not entitled to any immunity under the Colorado Governmental Immunity Act.

303.    At all times relevant hereto, Plaintiff McGill was under the care and treatment of the CHC Defendants' staff, including individual Defendants, through their contractual relationship with Jefferson County.

304.    The CHC Defendants are vicariously liable for the negligent acts and omissions by its agents and/or employees including those named individually herein, and directly liable for their own negligent failures in training, policies, and practices.

305.    Defendants had a duty to provide reasonable medical care and treatment to inmates at Jefferson County, including Mr. McGill, and to exercise reasonable care in the training and supervision of their employees.

306.    These duties of care are informed by state law.   Under C.R.S. 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."   The provision of adequate medical treatment and

humane care is a statutory obligation under this and other statutes. These duties are also informed by NCCHC standards.

307. Dr. Brill and employees of the CHC Defendants, while acting within the scope of their employment, variously committed negligent acts and omissions as set forth herein with respect to the care and treatment of Plaintiff McGill.

308. Dr. Brill had a doctor-patient relationship with Plaintiff at all times pertinent to this Complaint.

309. Nurse Battenhouse had a nurse-patient relationship with Plaintiff and was acting or failing to act within the scope of her employment with CHC Defendants at all times pertinent to this Complaint.

310. Other caregivers at the jail involved in the negligent treatment of Mr. McGill were acting within the scope of their employment with CHC related Defendants.

311. Involved caregivers at the jail, including Dr. Brill, Nurse Battenhouse and others named in the Statement of Facts, owed Mr. McGill a duty to exercise that degree of care, skill, caution, diligence and foresight exercised by and expected of nurses in similar situations.

312. Involved caregivers at the jail, including Dr. Brill, Nurse Battenhouse and others named in the Statement of Facts, grossly deviated from that standard of care and were negligent in failing to properly care for and treat Plaintiff McGill's known serious medical needs in the health care services they failed to provide. *Inter alia,* they further breached that duty of care in negligently failing to properly assess Mr. McGill, negligently charting his symptoms and complaints, negligently failing to call for a higher level evaluation and negligently failing to urgently transport him during a clear medical emergency.

43

313.    Defendants, directly and/or through their agents and employees, had at least a tacit understanding and consciously conspired and deliberately pursued a common plan or design to commit a tortious act.

314.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff McGill suffered significant physical pain, emotional suffering, permanent disability, and other damages.

315.    Plaintiff McGill is therefore entitled to general and compensatory damages for such pain and suffering and emotional distress and to special damages for past and future medical and health care related expenses, all in amounts to be proven at trial.

316.    Mr. McGill has also suffered lost past and future earnings and impaired earnings capacities in ongoing amounts to be ascertained in trial.

317.    Plaintiff hereby gives notice that he may be seeking to amend the complaint to add punitive damages against these Defendants because the injuries complained of are attended by circumstances of fraud, malice or willful and wanton conduct engaged in by their employees and agents.

## VI.        PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and enter the following relief:

1.    Award Plaintiff compensatory, non economic, consequential and economic damages as proven at trial against all of the Defendants;

2.    Award Plaintiff special damages as proven at trial;

3.    Award Plaintiff punitive damages relating to the federal claims brought in this matter

against Individual Defendants and Private CHC Defendants;

4.   Award Plaintiff punitive damages relating to the state law claims should Plaintiff file suitable amendment of the complaint;

5.   Award Plaintiff attorneys' fees and costs pursuant to the provisions of 42 U.S.C. §1988;

6.   Award Plaintiff attorneys' fees and costs as provided for under all applicable federal and state statutes;

7.   Award Plaintiff actual and treble damages as well as attorneys fees and costs under the CCPA.

8.   Award Plaintiff interest from the earliest possible date under appropriate federal and state statutes;

9.   Grant a preliminary and permanent injunction and corresponding declaratory relief pursuant to F.R.C.P. 57 and 65 compelling entity Defendants to develop and implement constitutional policies, training and supervision of their agents and employees for the care and treatment of incarcerated persons showing signs and symptoms of strokes;

10. Grant a preliminary and permanent injunction and corresponding declaratory relief pursuant to F.R.C.P. 57 and 65 compelling entity Defendants to develop and implement constitutional policies, training and supervision of their agents and employees with respect to the rights of inmates to familial association, especially with respect to medical emergency contact and proxy decision making authority;

11. All other appropriate relief at law and equity.

PLAINTIFF RESPECTFULLY REQUESTS A JURY TRIAL ON ALL TRIABLE ISSUES.

/s/ Anna Holland Edwards
Anna C. Holland Edwards
Erica T. Grossman
John R. Holland
HOLLAND, HOLLAND EDWARDS & GROSSMAN, PC
1437 High Street
Denver, CO  80218