IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-01080-RBJ-BNB


KENNETH MCGILL,

      Plaintiff.

v.

CORRECTIONAL HEALTHCARE COMPANIES, INC. d/b/a/ "CORRECTIONAL
HEALTHCARE MANAGEMENT, INC.";
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
CHC COMPANIES, INC.;
BOARD OF COUNTY COMMISSIONERS FOR JEFFERSON COUNTY COLORADO;
TED MINK, in his official capacity as Jefferson County Sheriff only;
JAMES BRILL, individually; and
GINA BATTENHOUSE, individually,

      Defendants.

---

## ORDER

---

    This matter is before the Court on a number of motions filed by the defendants: (1)

Defendants Correctional Healthcare Companies, Inc. d/b/a/ "Correctional Healthcare

Management, Inc.," Correctional Healthcare Physicians, P.C., CHC Companies, Inc., James

Brill, and Gina Battenhouse's Motion to Dismiss, or in the Alternative, Strike Portions of

Plaintiff's Amended Complaint [ECF No. 48]; (2) Jefferson County Board of County

Commissioners' and Jefferson County Sheriff Ted Mink's Motion to Dismiss Plaintiff's First

Amended Complaint [ECF No. 50]; and (3) Defendants' Joint Motion for Spoliation Adverse

Inference Instruction Related to the Plaintiff's Destruction of his Recorded Journal of the Events

Underlying his Lawsuit [ECF No. 53].[1]  The Court exercises jurisdiction over the federal causes

of action pursuant to 28 U.S.C. § 1331 and asserts supplemental jurisdiction over the state law

claim pursuant to 28 U.S.C. § 1367.

## BACKGROUND

For purposes of the pending motions, the Court must accept the well-pleaded factual

allegations contained in the plaintiff's First Amended Complaint [ECF No. 42] as true.  Mr.

McGill alleges that he suffered a stroke while serving a sentence in the Jefferson County

Detention Facility.  In spite of showing clear signs of stroke, defendants' employees refused to

hospitalize him or provide him with other emergency medical care for 16 hours.[2]

More specifically, Mr. McGill alleges that on the morning of September 17, 2012, he

began to feel dizzy and reported having a headache to jail staff.  He was brought down to the

medical unit, staffed by Correctional Healthcare or "CHC" personnel, where he was told that he

was probably dehydrated, instructed to drink water, and then sent back to his "pod" to rest until

dinner.  Mr. McGill continued to feel dizzy and, on his way to dinner, he slipped and missed the

bottom step of the stairs.  He was then brought to medical in a wheelchair.  At about 5:06 p.m.,

Matt Killough, PA-C, evaluated Mr. McGill and diagnosed him with either migraine associated

vertigo or benign paroxysmal positional vertigo.  No doctor came to see Mr. McGill at this time.

At 5:40 p.m. Mr. McGill was moved to a new "cave" (a group of beds within a pod).  Mr.

McGill was having so much trouble balancing that two other inmates had to assist him in the

housing move.  Mr. McGill and another inmate, Gilbert Renteria, told a jail officer, Deputy

---

[1] There is also one ripe pending motion filed by the plaintiff, Plaintiff's Motion to Amend Complaint to Add Punitive Damages Remedy Under State Law Negligence Claim [ECF No. 89], which will be addressed in a separate order at a later date.  There are two non-ripe motions [ECF Nos. 96 & 98] that will be considered once they are fully briefed.

[2] Technically Mr. McGill's symptoms began about 28 hours before he received emergency medical attention, but his symptoms did not present a clear sign of stroke for approximately 12 hours after onset.

Powell, that Mr. McGill needed help.  Deputy Powell responded that Mr. McGill would have to wait for a nurse who would be by shortly to pass out medications.  While sitting in the common space waiting for the nurse, Mr. McGill's symptoms dramatically escalated.  Vance Goetz, another inmate, came over and found that the right side of Mr. McGill's face was plainly drooping, and that his speech was slow and slurred.  Mr. Goetz told Mr. McGill that he believed he was having a stroke.

Mr. McGill then decided to call his wife to see if she could call the jail and help him get medical attention.  Mr. McGill had difficulty walking to the phone such that Mr. Goetz had to assist him and then help him dial the numbers.  The phone call, which began at 8:36 p.m., lasted 15 minutes.  During the call, which the Court has heard in its entirety,[3] Mr. McGill is slurring his words.  He says, among other things: "I think I had a stroke today"; "I keep telling them, they keep taking me downstairs and, and not doing anything"; "Something is really wrong"; "Jen, I'm scared"; "I can't feel anything . . . [unintelligible] . . .  my whole right side is like numb.  I can't talk.  You don't know how hard it is to even talk"; "I need help"; and "I'm scared to death." [ECF No. 89 Exhibit 2 (CD with recording)].  Mr. McGill's wife, Ms. McCracken, repeatedly told Mr. McGill that she could not understand him.[4]  *Id.*  Seemingly frustrated, Ms. McCracken pressed Mr. McGill to ask for help directly, saying "Obviously they can tell by the way that you're talking something is wrong."  *Id.*  Mr. McGill told his wife that his symptoms started that

---

[3] A recording was delivered on a compact disc as Exhibit 2 in ECF No. 89.  Though significant portions of the call are quoted in the Amended Complaint [ECF No. 42 at ¶¶ 57–67], the Court cites directly to the recording on file.  At the motion to dismiss stage "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

[4] Upon listening to the recording, the Court also finds that much of Mr. McGill's speech is quite difficult to understand; at certain times it becomes unintelligible.

morning at 8am (12 hours earlier), and that his symptoms were "just getting worse and worse." *Id.*

At the end of the call, Mr. Goetz spoke to Ms. McCracken directly and told her that "[s]omething is definitely wrong. His speech and he is having a hard time walking . . . it could have been a mini-stroke." *Id.* After securing medical help for Mr. McGill, Mr. Goetz continued, "It's definitely his right side. I mean his whole right side. He is slurring his words, and his mouth, when he talks, like his right side is dragging, you know. And when I just got him up out of the chair, he wanted to [unintelligible] to the phone and give you a call, it's like his right side is not working that well." *Id.* He said that when he first saw Mr. McGill that night he "was shocked because [Mr. McGill] couldn't even talk he was slurring . . . ." *Id.*

During the call Nurse Daria Arthur and Deputy Powell helped Mr. McGill into a wheelchair, while Mr. Goetz (as can be heard on the call) tells the nurse "I think he had a stroke" and "It's the right side, the whole right side of his body." *Id.* Mr. McGill was brought back to medical and seen by the charge nurse, Gina Battenhouse, RN, at some time between 8:50 p.m. and 9:15 p.m. Mr. McGill told Nurse Battenhouse that he thought he was having a stroke, and asked to see a doctor and go to the hospital. Nurse Battenhouse allegedly responded: "Are you a doctor? Have you had a stroke before? What do you know about strokes?" First Amended Complaint [ECF No. 42] at ¶ 73. According to the plaintiff, despite his slurring, limited right-side movement, and repeated statements about having a stroke, Nurse Battenhouse recklessly or deliberately did not chart his symptoms to their full extent. *Id.* at ¶ 76. Instead, she charted: "I/D brought to medical with c/o dizziness/anxiety. I/D brought in wheelchair . . . I/D states tingling feeling on right side." *Id.* at ¶ 77. She did not note that Mr. McGill's face was drooping and,

allegedly, falsely reported that his gait was normal and that he could walk around the room.  *Id.* at ¶¶ 78–79.  At this time, Mr. McGill was sent back to his pod.

Another inmate, Mike Moore, approached Mr. McGill in the pod.  Mr. Moore had previously been a paramedic.  He asked Mr. McGill to smile and saw that only the left side of his face moved normally; he saw drool coming from the right side of Mr. McGill's mouth.  He also asked Mr. McGill to try squeezing his hands and noted that his grips were unequal.  Finally, he witnessed Mr. McGill having trouble walking, finding that he had right-side weakness.  Mr. Moore told Mr. McGill that he was "watching him have a stroke," *id.* at ¶ 91, and convinced Deputy Powell to send a nurse.  When Nurse Arthur arrived, Mr. Moore remarked, "Can't you see that he is displaying all of the signs of a stroke?"  *Id.* at ¶ 93.  Nurse Arthur responded "something to the effect of 'I'm just here to give him an ibuprofen,'" *id.*, and performed no assessment of her own.

Mr. Moore continued to advocate for Mr. McGill and was subsequently told to mind his own business or be subject to jail sanctions.  Another inmate, Mr. Renteria, also advocated on behalf of Mr. McGill.  At one point Mr. Renteria approached Deputy Powell and said "You guys are screwing this up, he is having a stroke right now."  *Id.* at ¶ 97.  Close to midnight, Mr. Moore and Mr. Renteria finally convinced Deputy Powell to take Mr. McGill back to medical.  At approximately 11:54 p.m., Mr. McGill tearfully told Rachel Conner, LPN, that it felt like his whole right side was dead, that he just wanted to see a doctor, and that he needed to go to the hospital.  These statements are allegedly reflected in Nurse Conner's report.  *See id.* at ¶ 99.  Nurse Conner also noted that Mr. McGill had "guarded gait" and "slowed" speech.  *Id.* at ¶ 100.  Yet, when Mr. McGill was unable to walk to the bathroom, Nurse Conner told him "We know you can do it, we aren't here to take you to the bathroom."  *Id.* at ¶ 101.  At some point thereafter

5

Nurse Conner gave Mr. McGill a cup with liquid to swallow.  Mr. McGill told her that he could not swallow, which prompted Nurse Conner to dump out the liquid.  At no time was a doctor called to evaluate Mr. McGill.

At 1:59 a.m., Nurse Battenhouse reported that Mr. McGill was complaining of right-sided issues, but she failed to chart any other complaints or signs of stroke, instead writing "No hx [history] of stroke or TIA."  *Id.* at ¶ 105.  She then sent Mr. McGill to the Special Housing Unit ("SHU") until he could be seen by a doctor.  The SHU room in which he was placed had one mattress bed, which was occupied by another inmate.  Mr. McGill was not given a boat (device with a mattress) or other type of mattress and was thereafter left to lie on the concrete floor of the SHU until morning.  At some point during the night Mr. McGill began to yell that he needed help, that he was dying, and that he needed a doctor.  Instead of receiving medical attention he allegedly was told to "shut up" by Nurse Battenhouse and at least one jail official.  *Id.* at ¶ 109.

At 5:42 a.m. Nurse Battenhouse reported that Mr. McGill had been sleeping, and that he was able to eat his breakfast.  According to the plaintiff, he did not sleep at all that night, and he was also unable to swallow liquid or food (and therefore could not have eaten his breakfast).  He apparently reported his inability to swallow to Nurse Battenhouse, but she still reported that he was "swallowing just fine."  *Id.* at ¶ 112.  She also reported "I/D weak on right side" but wrote that Mr. McGill was "able to ambulate."  *Id.*

Later that morning there was a shift change wherein Nurse Battenhouse was replaced by Nurse Guthrie.  At about 7:38 a.m., Nurse Guthrie reported: "Patient is found standing in cell at door.  The patient is tearful and states that he believes he is having a stroke."[5]  *Id.* at ¶ 117; *see id.* at ¶ 122.  She assessed Mr. McGill, noting that his grips were not equal.  Nurse Guthrie also

---

[5] According to the plaintiff, this was the first time that his statements that he was having a stroke (which he had been making since 8:30 p.m. the night before) were noted in the medical records.

wrote that she gave Mr. McGill a teaspoon of water, and that he "handle[d] it well without coughing." *Id.* at ¶ 118. Yet, Mr. McGill alleges that he was actually unable to swallow the water, and that he told her that "it feels like my face is in my lap." *Id.* at ¶ 121. During this assessment, Mr. McGill's blood pressure was reported as 154/100. His baseline is typically around 120–130/80.

Nurse Guthrie called James Brill, M.D., to assess Mr. McGill. At around 9:00 a.m., over an hour after being called and over 12 hours after Mr. McGill allegedly presented clear stroke symptoms, Dr. Brill evaluated Mr. McGill. He reported that Mr. McGill was complaining of "difficulty moving right side and difficulty with speech." *Id.* at ¶ 126. He added that Mr. McGill was "tearful" and "frightened," and that he was "not moving right arm spontaneously and slurring speech." *Id.* at ¶ 128. He found that Mr. McGill had "[r]ight central facial weakness, weak right should shrug and turn of head to right. Weak right arm with pronator drift, [right] leg is weak but not as weak as the arm." *Id.* at ¶ 129. At this point Dr. Brill called in nursing staff and, in front of Mr. McGill, yelled at them for ignoring an obvious stroke.

At 9:45 a.m. Dr. Brill ordered an outside evaluation of an MRI. An ambulance was not called, and no other emergency measures were taken. Instead, Mr. McGill was handcuffed and shackled in a van on the way to the outpatient wing of Lutheran Medical Center. Because he was unable to move his right side, Mr. McGill could not sit up and would sometimes fall and slide across the van. Instead of being assisted by prison officials, the deputies in the van laughed at him, and one said "something along the lines of: '[Y]ou can stop pretending, you are getting what you wanted.'" *Id.* at ¶ 141.

After arriving at Lutheran Medical Center the MRI was performed, and its results were discussed with Dr. Brill. At this point it was approximately 1:00 p.m. The MRI revealed an

"acute left pontine infarct," showing that Mr. McGill had suffered an ischemic stroke. *Id.* at ¶¶ 144, 146. At this point Mr. McGill was brought to the emergency room. In all, it took over 16 hours after Mr. McGill started showing signs of a stroke (and making complaints that he believed he was having a stroke) for him to receive emergency medical treatment.

After being hospitalized, jail deputies allegedly refused to allow Mr. McGill to communicate with his wife. They also refused to communicate with his wife on his behalf. The night before Deputy Powell had told Ms. McCracken that Mr. McGill was fine (based upon what he had heard from medical personnel). No one had since called Ms. McCracken, even after Mr. McGill was brought to the ER. In fact, Ms. McCracken went to the jail the next day (the same day Mr. McGill was hospitalized) to see him. When she arrived, jail staff told her that Mr. McGill was no longer there, that he had been sent to the hospital, but that it wasn't an emergency or she would have been notified. Jail staff also told her that it was "against policy" to give her information regarding her husband's medical care, even though she was listed as his emergency contact. *Id.* at ¶ 158. No one would tell Ms. McCracken where Mr. McGill was hospitalized, forcing her to cold-call hospitals in an attempt to find him.

Jail staff repeatedly told Ms. McCracken that their policy required that Mr. McGill fill out an authorization form before they could disclose any information to her. Yet Mr. McGill was never presented with this form, even though he repeatedly asked to be given whatever forms were necessary so that he could communicate with his wife. Several days passed before Mr. McGill could reach his wife, which he managed to do by surreptitiously using a hospital phone that he was supposed to be using to order a meal. Ms. McCracken immediately came to the hospital to see him, but after a few minutes she was ordered to leave by one of the jail deputies. The next day Mr. McGill was transferred to Boulder Community Hospital. Once again, no

information was given to Ms. McCracken, and Mr. McGill was not permitted to call his family from the hospital.  Only after Mr. McGill threatened to check himself out of the hospital against medical advice (because he knew he could call his wife from the jail) did upper level jail staff permit Mr. McGill to call his wife.

At the time of filing his First Amended Complaint (January 6, 2014), Mr. McGill continued to suffer from some right-sided paralysis, to walk very slowly, to have difficulty with speech, and to speak very slowly.  He alleges that his right hand and grip remain severely compromised, and that his rotator cuff on his right side is damaged such that he has significant trouble lifting his right arm.  His right hip and hamstring are difficult for him to use, and he has had to relearn a gait, both of which make walking much more difficult and slow.  His vestibular nerves have been affected, making him feel constantly dizzy.  This dizziness requires him to wear a neck patch to treat his symptoms, but the patch has a host of side effects, including constant irritation of his skin, callousing, pain, and significant discomfort.  Yet without the patch Mr. McGill is so dizzy he can hardly walk.  While Mr. McGill has undergone extensive rehabilitation, his treating physician and other medical professionals have informed him that his recovery has hit a plateau, and that it is expected that he will have these persisting symptoms for the rest of his life.  He has also been told that he will never return to work.  Notably, Mr. McGill is in his mid-40's.

Mr. McGill has pled four claims for relief in his present suit.  He alleges that (1) the individual CHC Defendants violated the Eighth Amendment prohibition against cruel and unusual punishment;[6] (2) the Jefferson County Defendants and the (non-individual) CHC Defendants violated the Eighth Amendment prohibition against cruel and unusual punishment;

---

[6] This claim appears to only be asserted against Defendant Battenhouse, as Mr. McGill has voluntarily dismissed this cause of action as against Dr. Brill.  [*See* ECF No. 58].

(3) the Jefferson County Defendants and the CHC Defendants violated his Fourteenth

Amendment due process right to familial association; and (4) the CHC Defendants acted

negligently in providing him with inadequate medical care.  The defendants have responded with

two motions to dismiss as well as a motion for an adverse inference instruction based on bad

faith spoliation.

## ANALYSIS

**A. CHC Defendants' Motion to Dismiss or, in the Alternative, Strike Portions of the First Amended Complaint [ECF No. 48].**

The CHC defendants ask the Court to dismiss the claims against them for failure to file a

"short and plain statement of the claim showing that the pleader is entitled to relief" as required

by Fed. R. Civ. P. 8(a)(2).  They argue that this rule establishes "a ceiling and not a floor" such

that all that is permissible "is a *generalized statement of the facts* from which the defendant may

form a responsive pleading."  [ECF No. 48 at 3] (emphasis in defendants' brief).  There is some

irony here.  After plaintiff filed his original complaint, both sets of defendants filed motions to

dismiss for failure to state a claim.  In response to the Jefferson County defendants' motion,

plaintiff requested that, at a minimum, he be permitted to amend his complaint to add more

details.  The magistrate judge granted leave to amend, which led to the filing of plaintiff's

Amended Complaint.  Now the CHC defendants complain that this version is too long and too

detailed. [7]

---

[7]  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)
changed the landscape with respect to a plaintiff's complaint.  It seems to have become nearly inevitable
after those cases that defendants seek dismissal for failure to state a claim under Rule 12(b)(6), arguing
that the plaintiff has not pled sufficient facts to state a plausible claim.  Anticipating such motions (or in
reaction to them), plaintiffs commonly file complaints or amended complaints that are long and detailed.
Without endorsing the filing of excessive complaints, perhaps an overreaction to *Iqbal and Twombly*, it
seems to me that the defense bar has brought this upon itself to some degree with excessive motion

The Amended Complaint is certainly long – 46 pages containing 317 separately numbered allegations.  It is not a "short and plain" statement of the claim as I historically have understood those terms.  But, while it is probably longer than it needed to be, I do not find it to be rambling, unfocused, or full of irrelevant detail.  It lays out facts that, if true, are undoubtedly concerning.  I am not persuaded that it would advance the case or the cause of justice to strike the Amended Complaint and send plaintiff's counsel back to the drawing board to try to find a version that is detailed enough but not too much.

In the alternative to striking the whole complaint the CHC defendants ask the Court to strike certain portions of it under Fed. R. Civ. P. 12(f).  That rule permits courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  In particular, the defendants ask me to strike ¶¶ 222 and 224–232 of the Amended Complaint.  These paragraphs discuss negative online reviews of CHC employees (¶ 222); previous cases that were filed against CHC (apparently in another jurisdiction) and information developed in those cases (¶¶ 224–29); and a medical situation involving another inmate in the Jefferson County Detention Facility (¶¶ 230–32).

Under the style of pleading with which I grew up in the practice of law, I would be inclined to agree that this level of detail is unnecessary in a complaint.  But I also agree that these allegations are potentially relevant.  In particular, they go to whether the CHC entity defendants had a policy, practice, or custom of providing inadequate medical care to inmates in facilities nationwide.   These allegations go to the merits which are not before the Court at this time.  But given the level of pleading detail that is demanded of plaintiffs generally and this plaintiff in

---

practice.  In their motion the CHC defendants cite a number of cases predating *Twombly* and *Iqbal* that today are largely out of date.

particular, I am not persuaded that these paragraphs are so immaterial or impertinent that they need to be severed from the Amended Complaint.

The CHC defendants suggest that these allegations are "extremely prejudicial because they are likely to create adverse publicity" for them. [ECF No. 48 at 7]. That can be said of many lawsuits and is not, in itself, a reason to strike uncomfortable allegations. The CHC defendants take this argument one step further and suggest that publicity arising from these allegations could prejudice the jury pool against CHC: "To allow these paragraphs in the Amended Complaint could lead to additional media reports that would paint the Defendants in an even worse light, taint the potential juror pool, and consent to Plaintiff's sensationalizing of his allegations." [ECF Nol. 48 at 9]. That is pure speculation, at best. Even if the local media chooses to publish something about this case, and even if it casts CHC in a bad light, I have no reason to suspect that we cannot find seven jurors whose impartiality has not been tainted by media coverage. Frankly, this argument, essentially grasping at straws, tends to diminish the credibility of the CHC defendants' arguments as a whole.

**B. Jefferson County Board of County Commissioners' and Jefferson County Sheriff Ted Mink's Motion to Dismiss Plaintiff's First Amended Complaint [ECF No. 50].**

This motion asks the Court to dismiss the plaintiff's Amended Complaint under Fed. R. Civ. P. 12(b)(6) as against the Jefferson County Board of County Commissioners and Jefferson County Sheriff Ted Mink (the "Jefferson County defendants"). The defendants assert the following five grounds in support of the motion: (1) the plaintiff's claims regarding improper medical treatment or misdiagnosis were medical negligence claims that did not rise to the level of a constitutional violation; (2) the plaintiff has failed to identify any policy, practice, or custom underlying his constitutional claims; (3) the plaintiff lacks standing to state a claim for violation

of his right to familial association; (4) the plaintiff fails to state a claim for violation of his right

to familial association; and (5) the Board of County Commissioners is not a proper party.

Notably, none of the CHC defendants has filed a 12(b)(6) motion on any of these grounds.

Therefore, the Court only addresses the sufficiency of the pleadings as they relate to the

Jefferson County defendants.

I begin with the fifth argument. Under Colorado law, "[i]t is the duty of the board of

county commissioners, as often as they deem necessary, but at least once annually, to make

personal examination of the jail of its county, its sufficiency, and the management thereof and to

correct all irregularities and improprieties therein found." C.R.S. § 17-26-126. However, "the

Board does not exercise managerial control over either the sheriff or the detention center and its

staff." *Terry v. Sullivan*, 58 P.3d 1098, 1102 (Colo. Ct. App. 2002). The Board does not have a

duty to ensure an inmate's safety at a detention center. *See e.g.*, *id.*; *Frazier v. Jordan*, No. 06-

1333, 2007 WL 60883, at *6 (10th Cir. Jan. 10, 2007). That said, a plaintiff may state a claim

against the Board by describing an unconstitutional policy or custom in place at a detention

center that was implemented or established by the Board of County Commissioners. *See e.g.*,

*Frazier*, 2007 WL 60883 at *6; *Kershaw v. Robinson*, No. 09-CV-01872-BNB, 2009 WL

2957304, at *2 (D. Colo. Sept. 15, 2009). In *Carranza Reyes v. Park Cnty. Bd. of Cnty.

Comm'rs*, No. 05-CV-377-WDM-BNB, 2007 WL 2381405 (D. Colo. Aug. 17, 2007), the late

Judge Miller wrote (and I agree) that "[s]imply entering into a contract . . . is not sufficient to

establish a 'policy,' where the Sheriff and his staff, not the Board, had the authority to

determination how . . . [the inmates] would be treated." *Id.* at *8. Notably, Mr. McGill alleges

that the Board's contract with CHC incentivizes (but does not in and of itself establish) a policy

or practice favoring delay in the provision of emergency medical care to inmates. Because the

contract did not directly create the allegedly unconstitutional policy the Board cannot be found liable for implementing it.  The Board of County Commissioners is therefore not a proper party, and all claims against it are hereby dismissed with prejudice.

Moving along to the familial association arguments, both fail at this stage of the case. First, the Jefferson County defendants argue that Mr. McGill has no standing to bring an interference with familial association claim because he suffered no actual injury.  The defendants rely on a small portion of Mr. McGill's Amended Complaint where he alleges being put on the Do Not Resuscitate ("DNR") list without his knowledge or consent.  Once Mr. McGill discovered the mistake, he rectified it; he was never harmed by the error.  I agree that those allegations alone would not confer standing.  However, the DNR mistake is not the only injury that Mr. McGill's alleges.  He claims that he "suffered emotional distress, upset, anxiety, and worry" during the time he could not contact his wife.  Amended Complaint [ECF No. 42] at ¶ 197.  These allegations are sufficient to state an actual injury and confer standing.

Further, Mr. McGill sufficiently pleads claim of interference with his right to familial association.  The right of familial association is "properly based on the 'concept of liberty in the Fourteenth Amendment.'"  *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993) (citation omitted).  The right inheres in the substantive due process protections that safeguard individuals from arbitrary acts depriving them of life, liberty, or property.  *See id.*  The 14th Amendment protects the intimate associational right between spouses.  *See Suasnavas v. Stover*, 196 F. App'x 647, 655 (10th Cir. 2006) (unpublished) (citing *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1190 (10th Cir. 1985)).

"[A]n allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983." *Trujillo*, 768 F.2d at 1190.

> Not every statement or act that *results* in an interference with the rights of intimate association is actionable. Rather, to rise to the level of a constitutional claim, the defendant must *direct* his or her statements or conduct at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship.

*Griffin*, 983 F.2d at 1548 (citing *Trujillo*, 768 F.2d at 1190) (emphasis in original).

In this case, Mr. McGill has alleged that the jail deputies refused to allow him to communicate with his wife and refused to communicate with his wife for him while he was in critical condition in the hospital. Amended Complaint [ECF No. 48] at ¶ 153. Further, Mr. McGill alleged that jail staff told his wife, Ms. McCracken, that it was "against policy" to inform her about her husband's medical care even though she was listed as his emergency contact. *Id.* at ¶ 158. Her repeated requests for information over the next several days were "purposely ignored." *Id.* at ¶ 159. Mr. McGill also claims that individual deputies were "specifically prevented from presenting Mr. McGill" with the necessary forms that would have enabled him to contact his wife, in spite of his requests. *Id.* at ¶¶ 161–62. Mr. McGill was kept from communicating with his wife for days, all the while Ms. McCracken was left without any information as to Mr. McGill's whereabouts. Further, jail deputies forced Ms. McCracken to leave the hospital just minutes after she came to visit, after days of searching for her husband. *Id.* at ¶ 167. After discovering that Ms. McCracken knew where her husband was being treated the jail transferred Mr. McGill to a different hospital and once again refused to tell Ms. McCracken where he had been taken. *Id.* at ¶ 168. According to Mr. McGill, "[f]inal decision makers and delegated final decision makers intentionally determined in this case not to allow Ms. McCracken to know what had happened to her husband or where he was, pretending they

did not have the notification forms they required when in fact Ms. McCracken was listed as the person to be notified within [the jail's] system." *Id.* at ¶ 238.  According to Mr. McGill, in performing these acts the Jefferson County defendants intentionally interfered with his marital relationship and therein caused him actual harm.

The Jefferson County defendants respond to all of these allegations by stating that Mr. McGill's allegations "fall well short of demonstrating the alleged [jail] policy is invalid or not rationally related to a legitimate penological concern." [ECF No. 50 at 13].  That is not an issue that I address at the motion to dismiss stage.  The defendants' argument is based in the contention that substantial deference is afforded to the government in the context of jail administration.  It is true that this claim, like all other Fourteenth Amendment claims, requires a balancing of the plaintiff's interests against the relevant state interests.  *See Griffin*, 983 F.2d at 1547.  However this test is more aptly applied in a motion for summary judgment (if there is no genuine and material dispute of fact) or presented to a jury at trial.  At this stage in the litigation all that is required is sufficient factual allegations that state actors intentionally interfered with the plaintiff's right to familial association.  Mr. McGill meets this low threshold.

Next, the Jefferson County defendants argue that Mr. McGill's deliberate indifference claims relating to his medical treatment on the night of his stroke are actually negligence claims. I agree, of course, that the Jefferson County defendants are not medical professionals and cannot be accused of medical negligence.  (Notably, the claims of deliberate indifference in providing medical care to Mr. McGill were only asserted against the individual CHC defendants, who have not moved to dismiss them under Rule 12(b)(6).)  This reasoning, however, does not necessarily apply to claims that go to whether a policy, practice, or custom was in place that contributed to the furnishing of constitutionally inadequate medical care in the jail.  Regarding the policy,

practice or custom argument, Mr. McGill makes various allegations against the Jefferson County

defendants about their supervision and training of medical personnel, but these either

misconceive the role of the Sheriff (who has no expertise in the practice of medicine or nursing)

or are purely conclusory allegations that the Court need not accept. *See, e.g.*, First Amended

Complaint [ECF No. 42] ¶¶ 206, 207, 213.  The only allegations that are sufficient to survive

dismissal at this stage, and then just barely, are those that allege that the Jefferson County

defendants have created financial incentives that discourage appropriate hospitalization of

inmates as well as sanctions for instances of improper care, and that the Jefferson County

defendants have a policy in place that interfered with Mr. McGill's right to familial association.

*See id.* at ¶¶ 218, 236 and 237.

At bottom, I must follow the admonition that a "district court's dismissal of a civil rights

complaint on a 12(b)(6) motion is scrutinized with special care." *Petty v. Cnty. of Franklin,*

*Ohio*, 478 F.3d 341, 348 (6th Cir. 2007) (citation and internal quotation marks omitted).  The

Court cannot dismiss the claims against the Jefferson County defendants unless, after taking the

factual allegations as true, there is no plausible claim on the face of the pleadings.  A plausible

claim is a claim that "allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  At this stage in

the litigation, Mr. McGill has (to the extent noted) met this low burden.

**C. Defendants' Joint Motion for Spoliation Adverse Inference Instruction Related to**
**the Plaintiff's Destruction of his Recorded Journal of the Events Underlying his Lawsuit**
**[ECF No. 53].**

The final motion filed by the defendants asks the Court to issue an adverse inference

instruction with respect to the plaintiff's failure to disclose a voice recording of certain events

underlying this lawsuit and subsequent destruction of said recording.  Such relief is extreme in nature and only rarely granted.

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *E.E.O.C. v. Dillon Companies, Inc.*, 839 F. Supp. 2d 1141, 1144 (D. Colo. 2011) (internal quotation marks and citation omitted).  "A court has both inherent power as well as authority under Fed. R. Civ. P. 37(b)(2) to sanction a litigant for the destruction or loss of evidence." *Id.*  First, the Court must determine whether the evidence would have been relevant to an issue at trial. *Id.*  If it would have been, "sanctions are appropriate when (1) a party had a duty to preserve the evidence because it knew, or should have known, that litigation was imminent, and (2) the other party was prejudiced by the destruction of the evidence." *Id.*  "[T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997).  Therefore, "[t]he adverse inference must be predicated on the bad faith of the party destroying the records." *Id.* "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id.* (citation omitted).  The Court has reviewed the briefs and the attached exhibits submitted by the parties and finds that the defendants have failed to meet their burden of showing that the recording was destroyed in bad faith.  Therefore, the motion is denied.

Following hospitalization for his stroke Mr. McGill began seeing Alan Schultz, DO, at Foothills Family Medicine in Wheat Ridge, Colorado.  On the advice of Dr. Schultz Mr. McGill made a three-part voice recording discussing the events that took place surrounding his stroke.

Dr. Schultz recommended that he make this recording "so he doesn't have to relive [the experience] on a regular basis." [ECF No. 53-1 at 4]. According to Mr. McGill he never shared these recordings with his attorney. January 8, 2014 Deposition of Kenneth McGill [ECF No. 53-3 at 4] at 134:18–19. His attorney also stated that she "never kn[ew] about the recordings." *Id.* at 139:16–17 [ECF No. 53-3 at 8]. In fact, Mr. McGill stated that he forgot about the recordings until just a few days before his deposition. *Id.* at 139:1; 139:12–15. When defense counsel asked if Mr. McGill could produce these voice recordings, he responded that he was not sure whether he still had copies of them. In particular, he said that had experienced a problem with his iPhone requiring him to "get it switched out" but that he believed all of his files had been backed up. *Id.* at 139:8–11. However, he was not positive that the files had synced with his computer. *Id.* at 139:1–5. He also could not remember whether he had deleted one of the recordings after listening to it and not liking how it sounded. *Id.* at 140:6–9 [ECF No. 53-3 at 9]. Notably, very limited testimony was elicited regarding the content of the recordings. Defense counsel asked Mr. McGill, "And that's a version of what took place on September 17 and 18 and thereafter?" to which Mr. McGill replied "I believe so." *Id.* at 134:11–13 [ECF No. 53-3 at 4]. In the end, Mr. McGill was unable to track down copies of these three recordings.

The Court finds that the defendants have not met their burden of showing that the loss of these recordings should result in an adverse inference instruction against the plaintiff. Presuming (without deciding) that the voice recordings would have been relevant to an issue at trial, without eliciting testimony on the content of the recordings the defendants are unable to show that they have been prejudiced by their loss. Even supposing the defendants were prejudiced, the defendants have also not shown that Mr. McGill destroyed or lost these recordings in bad faith. According to his own testimony, the honesty of which this Court has no reason to doubt, Mr.

McGill may have deleted one of the three recordings because he did not like how it sounded upon listening to a 30-second clip of it.  *Id.* at 140:6–12 [ECF No. 53-3 at 9].  Further, any loss of the recordings appears to be due to a mistake or oversight when Apple backed up Mr. McGill's iPhone.  The defendants can attest that the loss and possible deletion were made in bad faith, but they have not persuaded this Court.  Therefore the motion is denied.

**ORDER**

For the foregoing reasons, Defendants' motions at Docket Nos. 48 and 53 are DENIED. Defendants' motion at Docket No. 50 is GRANTED in part and DENIED in part.  The motion is granted only to the extent that Defendant Board of County Commissioners for Jefferson County, Colorado is hereby DISMISSED WITH PREJUDICE.

DATED this 27th day of June, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge