Case 1:13-cv-01080-RBJ-BNB   Document 106   Filed 07/11/14   USDC Colorado   Page 1 of 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.   1:13-cv-01080-RBJ-BNB

KENNETH MCGILL                                                                                       Plaintiff,

v.

CORRECTIONAL HEALTHCARE COMPANIES, INC. d/b/a
"CORRECTIONAL HEALTHCARE MANAGEMENT, INC.",
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.,
CHC COMPANIES, INC.,
BOARD OF COUNTY COMMISSIONERS FOR JEFFERSON COUNTY
COLORADO,
TED MINK, in his official capacity as Jefferson County Sheriff only,
JAMES BRILL, individually, and
GINA BATTENHOUSE, individually,                                              Defendants.

---

**MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFF'S FIRST CLAIM FOR RELIEF
BY CORRECTIONAL HEALTHCARE COMPANIES, INC., CORRECTIONAL
HEALTHCARE PHYSICIANS, P.C., CHC COMPANIES, INC., JAMES BRILL, AND
GINA BATTENHOUSE**

---

Defendants, Correctional Healthcare Companies, Inc., Correctional Healthcare Physicians, P.C., CHC Companies, Inc., James Brill, and Gina Battenhouse, hereafter referred to as "Defendants", by and through their attorneys, Tiemeier & Stich, P.C., hereby submit this Motion for Partial Summary Judgment on Plaintiff's First Claim for Relief, Violation of 42 U.S.C. § 1983 Eight Amendment Prohibition Against Cruel and Unusual Punishment.  In support of this Motion, Defendants state as follow:

## I. OVERVIEW OF MOTION

On September 17-18, 2012, Mr. McGill was seen by Nurse Battenhouse, Dr. Brill, Physician Assistant Killough, Nurse Arthur, Nurse Haynes, Nurse Conner, and Nurse Guthrie, all employees of Correctional HealthCare (CHC). A total of seven (7) examinations were performed on Mr. McGill (and contemporaneously entered into the patient's electronic medical chart) by Nurses Haynes, Guthrie, Conner and Battenhouse, and Physician Assistant Killough in a time period of less than 20 hours. Mr. McGill's vital signs and neurologic signs were examined an additional eight (8) times during the same time period. Ms. Battenhouse placed him in the Medical Observation Unit overnight to keep a closer watch on him, and went by his observation cell to check on him in the early morning hours. Nurse Battenhouse made an appointment the evening of 9/17 for Mr. McGill to be examined by Dr. Brill when he came into the jail the morning of 9/18. Nurse Guthrie, after her examination of Mr. McGill the morning of 9/18, called Dr. Brill at about 7:30 am to see the patient, and Dr. Brill was at bedside at 9:00 am. Mr. McGill's medical records, which are electronically date and time stamped, and which were made contemporaneous with the examinations, show a pattern of attentive observation and examination. They do not show deliberate indifference. The nurses did not make a diagnosis of stroke, which at best could be a claim for negligence. But, as a matter of law, the repeated examinations and evaluations and charting of Mr. McGill's condition do not rise to the level of deliberate indifference.

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct.


2548, 2553 (1986). The moving party has the initial burden to show the absence of evidence to support the claim. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). Once that burden is met, the non-moving party may not rest upon the mere allegations of its pleadings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510 (1986); *see also Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (mere assertions or conjecture as to factual disputes are not enough to survive summary judgment). Rather, the non-moving party must set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250; *see also Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557-58 (10th Cir. 2001) ("Unsupported conclusory allegations thus do not create a genuine issue of fact. To withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.") (citations omitted).

### III.  LEGAL REQUIREMENTS FOR §1983 CLAIM

Plaintiff does not state a claim for relief for deliberate indifference under his § 1983 Eighth Amendment claim against Dr. Brill or Ms. Battenhouse. Plaintiff's claim fails to satisfy the subjective prong required to prove deliberate indifference.

#### A.  Elements of a §1983 claim of deliberate indifference to an inmate's serious medical needs.

"Deliberate indifference" has been characterized as a "stringent standard of fault." *Board of the County Commissioners v. Brown*, 520 U.S. 397, 410 (1997). It requires a higher degree of fault than negligence or even gross negligence. *Berry v. City of Muskogee*, 900 F.2d 1489, 1495-96 (10th Cir. 1990). A plaintiff bears the burden of proof in a claim for deliberate indifference for serious medical needs. *See Martinez v. Beggs*, 563 F.3d 1082, 1088-1089 (10th

Cir. 2009).

A claim against prison officials for deliberate indifference has an objective and subjective component. *Mata*, 427 F.3d at 751.  As to the objective component, Plaintiff must show that the alleged deprivation was "sufficiently serious."[1] *Id.*  Regarding the subjective component, he must prove that Defendants were aware of an "excessive risk to inmate health or safety." And consciously disregarded it. *Id.*

Under the subjective component, a prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both [1] be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [2] he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "The subjective component is akin to 'recklessness in the criminal law,' where, to act recklessly, a person must 'consciously disregard' a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (*quoting Farmer*, 511 U.S. at 837).  "The subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232.

"Medical judgment" includes decisions over types of medication and referrals to specialists. *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992); *Franklin v. Kansas Dept. of Corrections*, 160 Fed. Appx. 730, 735 (10th Cir. 2005) (unpublished) ("Whether a specialist should be consulted is generally considered an exercise of medical judgment that is not subject to

---

[1] Defendants do not contest that the Plaintiffs have met the requirements for the objective component, as this component is met if Plaintiff claims to have suffered a lifelong handicap, permanent loss, or considerable pain.  *See Mata*, 427 F.3d at 751.

redress under the Eighth Amendment."). "[P]risoner complaints directed at the wisdom or quality of the medical care provided do not state an Eighth Amendment violation, even if the treatment constitutes medical malpractice." *Upp v. Shartrand*, 861 F. Supp. 1022, 1023 (D. Kan. 1994) (citation omitted); *Self*, 439 F.3d at 1233 (citation omitted); *see also Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980), *disapproved on other grounds*. As the Supreme Court has stated, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. A prisoner's mere disagreement with the treatment decisions of the jail medical staff alone do not support a claim of deliberate indifference. *Ramos*, 639 F.2d at 575; *Pa. v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 718-724 (1987).

## IV.   FACTS

Plaintiff was in the Jefferson County Detention Facility for alcohol related driving offenses. Complaint, at 6. While working in the kitchen on September 17, 2012, Mr. McGill experienced dizziness and went to the medical clinic at the jail. Here is a timeline of his subsequent examinations by the CHC health care providers (times are approximate, as they are recorded in the chart at the time the health care provider finishes the entry, after the examination has been completed):

**12:15 pm**: Nurse Haynes evaluated Mr. McGill for a complaint of dizziness and headaches, and made an appointment for him to be examined by a physician. (**Exhibit 1**, CHC Medical Records, CHC 30)

**3:20 pm:** Mr. McGill was transported to medical and examined by Physician Assistant Matt Killough. (**Exhibit 1**, CHC 38) Mr. Killough diagnosed Mr. McGill with migraine-related vertigo or benign postural paroxysmal vertigo, and prescribed him medications.

5

**8:50 pm:** Mr. McGill, while speaking on the phone with his wife, experiences dizziness, is unable to stand, and is seen by Nurse Arthur, who did a quick assessment before instructing the deputy to take him to the medical clinic in a wheelchair. (**Exhibit 2**, Jefferson County Sherriff Office Records, JCSO 60).

**9:00 pm:** Mr. McGill is seen by Gina Battenhouse, R.N. who notes complaints of "dizziness/anxiety" and tingling on the right side. (**Exhibit 1**, CHC 43) She does a complete examination, noting, among other things, that his strength (hand grips) was normal and strong bilaterally, his gait was normal and he "walked around in clinic with no issue or complication." She noted that McGill said "he had just gotten off the phone with his wife and was very upset" and was anxious and worked up about it. She noted that "he stated at 9:15 that he would like to go back to his cell and go to sleep", and that he "ambulated normally back to his cell." When checked on by medical at 10:00 pm in his "cave", he was sleeping.

**11:30 pm:** Nurse Conner examined Mr. McGill when he returned to the clinic with complaints of numbness and tingling to his right side. She examined him, noting no facial asymmetry, normal pupils, normal grip strength, "guarded" gait and speech that was "slowed, but not slurred." (**Exhibit 1**, CHC 38)   Her assessment was that he had pain of unknown origin, and kept him in medical for continued monitoring and neurologic exams every 15 minutes for an hour, at which time she would re-assess him.

**11:55 pm:** Neuro check and vital signs taken by Nurse Conner, normal except for "extremities weak." (**Exhibit 1**, CHC 38)

**00:32 am**: On September 18, vitals and neuro check were repeated by Nurse Battenhouse, and were normal except for "extremities weak." (**Exhibit 1**, CHC 40)

6

**00:45 am:** Nurse Conner performed neuro check and vital signs, which were normal except for "extremities weak." (**Exhibit 1**, CHC 40).

**01:08 am**: Vitals and neuro check were repeated by Nurse Battenhouse, and were again normal except for "extremities weak." (**Exhibit 1**, CHC 40)

**01:18 am:** Nurse Battenhouse assessed Mr. McGill, noting a complaint of right sided weakness. On examination, however, he was able to walk to the bathroom unaided with "minor weakness." Her neuro examination of him, which included checking for equal grip strength, was normal. (**Exhibit 1**, CHC 43). He was alert and oriented times 3 (person, place, time), no headache, no nausea, and "sleeping comfortably at 01:16." Nurse Battenhouse placed him on the list to see Dr. Brill the next morning. (**Exhibit 1**, CHC 30). She planned to perform one more neuro check and then send him back to his "pod."

**01:30 am**: Vitals and neuro check were repeated by Nurse Battenhouse, and were again normal except for "extremities weak." (**Exhibit 1**, CHC 40).

**01:59 am:** Nurse Battenhouse keeps Mr. McGill in Medical Observation Unit 12 for "observation until seen by Dr. for safety." (**Exhibit 1**, CHC 43). He was placed in a "boat" on the cell floor to preclude a fall from a bunk.

**05:42 am:** Nurse Battenhouse notes that Mr. McGill was checked on at 04:00 and was sleeping with no distress. (**Exhibit 1**, CHC 43). He was again checked on at breakfast at 05:30 and "was weak on the right side, but able to ambulate." She noted he was swallowing fine and ate his breakfast.

**07:38 am:** Nurse Guthrie notes that Mr. McGill was "tearful and states he believes he is having a stroke. When asked why he believes this he states he was told that by another inmate."

7

(**Exhibit 1**, CHC 42). She did an examination and noted that his grip strength was not equal, but was different each time she tested it. He had normal gaze and no "drifting" of his limbs or ataxia, a test for stroke signs. He was assessed for facial palsy, "but when asked to lift eye brows, puff out cheeks, smile, frown, he cannot be assessed because he does not co-operate with the exam. He did stick out his tongue, and no deviation from mid-line was noted. His blood pressure was moderately elevated at 164/100, but otherwise vital signs were normal. He swallowed normally. Nurse Guthrie called Dr. Brill and kept Mr. McGill in medical until Dr. Brill could come in and assess him.

**09:00 am:** Dr. Brill saw Mr. McGill, finding right central weakness, weak right shoulder shrug and turn of head to right, weak right arm with pronator drift, and left leg weak but not as weak as the arm. (**Exhibit 1**, CHC 38). At 9:45 a.m., Dr. Brill ordered an outside evaluation with MRI, because he believed Mr. McGill was having a pontine stroke. Dr. Brill sent him for MRI, rather than to the ER, because he knew from his experience in working in the ER for decades (he created the Emergency Department at UCLA) that they would order a CT scan. (**Exhibit 3**, Deposition of James Brill, M.D., 164-165). Dr. Brill suspected Mr. McGill was having a pontine stroke, which is not usually detectable on CT scan, so time would be wasted by sending him to the ER. The MRI showed that Mr. McGill indeed had an "acute left pontine infarct" caused by an ischemic stroke.

## V. ARGUMENT

### I. Nurse Gina Battenhouse did not draw the inference that Mr. McGill was having a stroke.

To state a claim for relief under § 1983, Mr. McGill must satisfy the second prong of the

subjective component, which is that Nurse Battenhouse drew the inference that, based on the facts presented to her, Mr. McGill was having a stroke. *See Farmer*, 511 U.S. at 837. However, Nurse Battenhouse did not have the culpable state of mind required. *See id.*

Nurse Battenhouse examined the Mr. McGill numerous times during the evening of September 17th and the morning of the 18th. Nurse Battenhouse observed the Mr. McGill, beginning at 8:50 p.m. on September 17th. Nurse Battenhouse charted what she observed and there is no testimony from Ms. Battenhouse or anyone else that she knew Mr. McGill was having a stroke. In fact, Mr. McGill was seen by four other nurses (Haynes, Daria, Conner, and Guthrie), one physician assistant (Killough), and two deputies (Powell and Vowers), and none of them made any statement or noted that they drew an inference that Mr. McGill was having a stroke. However, Mr. McGill was diagnosed with: 1) dehydration; 2) a migraine associated with vertigo; and 3) dizziness and anxiety. None of these diagnoses make it evident that Nurse Battenhouse was "expressly aware" of Mr. McGill's serious medical needs – a stroke. Although these may have been incorrect diagnoses, a misdiagnosis does not support a claim for a violation of a prisoner's Eighth Amendment rights. *See Estelle*, 429 U.S. at 106; *Ramos*, 639 F.2d at 575. In a case such as this, where the record shows a series of sick calls, examinations, diagnoses and medication, it cannot be said that there was a deliberate indifference to the prisoner's complaints. *See Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976). Nurse Battenhouse examined and observed Mr. McGill numerous times in a single shift and made a good faith effort to examine, diagnose, and treat the Mr. McGill. This defeats a claim for deliberate indifference. *See Mata*, 427 F.3d at 761 (claim denied against a good faith effort to diagnose and treat the plaintiff's medical condition despite failing to diagnose a heart attack). Therefore, Mr. McGills' claim

9

against Gina Battenhouse should be dismissed.

> **II.     Dr. James Brill did not exercise an extraordinary degree of neglect in diagnosing and treating Plaintiff.**

Plaintiff's first claim for relief under §1983 is also against Dr. James Brill.  In order to state a claim against Dr. Brill, Plaintiff must do more than challenge the adequacy of medical treatment provided to Plaintiff by Dr. Brill.  *See Self*, 439 F.3d at 1233.  However, Mr. McGill's claim only shows that he disagreed with the medical judgment of Dr. Brill, which does not create a claim for relief.  *See Olson v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993).

Once Dr. Brill examined Mr. McGill and concluded he had a stroke, he ordered an outside evaluation for an MRI to confirm his diagnosis.  This was the best decision in Dr. Brill's medical judgment and does not support a deliberate indifference to Mr. McGill's serious medical needs.  *See Ledoux*, 961 F.2d at 1537; *Self*, 439 F.3d at 1232.  Plaintiff's expert neurologist Dr. William Jones testified that the only treatment available to Mr. McGill for his stroke was Tissue Plasminogen Activator, or tPA.  (**Exhibit 4**, Deposition of William Jones, M.D., 93-95).  Plaintiff's family practice expert witness testified that, by the time Dr. Brill saw Mr. McGill, it was too late to administer tPA.  (**Exhibit 5**, Deposition of Dr. Schultz, 21-22).  Consequently, there was no emergency or even urgency confronting Dr. Brill the morning of September 18, 2012, and his choice of MRI did not constitute deliberate indifference.  At the most, Mr. McGill's Complaint may only support a claim for medical malpractice, and as the Supreme Court has stated, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle*, 429 U.S. at 106.  Therefore, Mr. McGill's claim against James Brill, M.D. should be dismissed.

## VI.  CONCLUSION

The facts of this case as developed during discovery do not establish that Defendants knew of a substantial risk of harm to Plaintiff and deliberately disregarded that risk.  The Complaint only establishes that Plaintiff disagrees with Defendants' medical judgment. Therefore, Plaintiffs have not established a claim against the individual CHC Defendants for a violation of 42 U.S.C. § 1983 Eighth Amendment prohibition against cruel and unusual punishment.

DATED  JULY 11, 2014

                                                          Respectfully submitted,
                                                          **TIEMEIER & STICH, P.C.**

                                                          /s/ C. Gregory Tiemeier
                                                          C. Gregory Tiemeier
                                                          Daniel Mauk
                                                          1000 East 16th Avenue
                                                          Denver, CO  80218
                                                          Telephone:  303-531-0022

                                                          *Attorneys for Defendants:*
                                                          *Correctional Healthcare Companies, Inc.,*
                                                          *Correctional Healthcare Physicians, P.C.,*
                                                          *CHC Companies, Inc., James Brill, and*
                                                          *Gina Battenhouse*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on this 11th day of July, 2014, I electronically filed the foregoing DEFENDANTS' CORRECTIONAL HEALTHCARE COMPANIES, INC., CORRECTIONAL HEALTHCARE PHYSICIANS, P.C., CHC COMPANIES, INC., JAMES BRILL, AND GINA BATTENHOUSE, F.R.C.P. 12(B)(6) MOTION TO DISMISS PLAINTIFFS' FIRST CLAIM FOR RELIEF with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Anna Holland Edwards, Esq.
Erica Grossman, Esq.
John Robert Holland, Esq.
Holland, Holland Edwards & Grossman, PC
1437 High Street
Denver, CO  80218
303-860-1331 telephone
303-832-6506 facsimile
anna@hheglaw.com
erica@hheglaw.com
john@hheglaw.com
*Attorneys for the Plaintiffs*

Rebecca Klymkowsky, Assistant County Attorney
Writer Mott, Assistant County Attorney
100 Jefferson County Parkway, Suite 5500
Golden, CO  80419
rklymkow@co.jefferson.co.us
wmott@co.jefferson.co.us

*Attorneys for Board of County Commissioners for Jefferson County Colorado*
*Ted Mink*

/s/ Jeffery Burgdoff

Paralegal