IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-01080-RBJ-BNB

KENNETH MCGILL,

    Plaintiff.

v.

CORRECTIONAL HEALTHCARE COMPANIES, INC. d/b/a/ "CORRECTIONAL HEALTHCARE MANAGEMENT, INC.";
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
CHC COMPANIES, INC.;
TED MINK, in his official capacity as Jefferson County Sheriff only;
JAMES BRILL, individually; and
GINA BATTENHOUSE, individually,

    Defendants.

# ORDER

This matter is before the Court on Defendant Sheriff Mink's Motion for Summary Judgment [ECF No. 104]. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

The background of this case was fully outlined in the Court's June 27, 2014 Order [ECF No. 103] and is incorporated herein. The present motion concerns whether Defendant Sheriff Mink is entitled to summary judgment on the sole claim remaining against him, a § 1983 deliberate indifference action alleging a failure to provide adequate medical care in violation of the Eighth Amendment. Sheriff Mink argues that "there is no evidence to support a claim that the Sheriff's Office has or had a policy, practice, or custom of not sending out inmates for

1

emergency medical care." [ECF No. 104 at 2]. In response, Mr. McGill contends that there are two bases for liability against the Sheriff's Department: (1) direct entity liability for an unconstitutional policy, practice, or custom; and (2) indirect liability through the non-delegable duty doctrine for the policy, practice, or custom of the CHC defendants. [ECF No. 120 at 2]. The Court agrees with the defendant that there is no evidence to support direct entity liability, but also agrees with the plaintiff that the defendant must remain in the action with respect to indirect liability on a non-delegable duty theory.

## LEGAL STANDARD

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). When deciding a motion for summary judgment, the Court considers "the factual record, together with all reasonable inferences derived therefrom, in the light most favorable to the non-moving party . . . ." *Id.* The moving party has the burden of producing evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In challenging such a showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## ANALYSIS

### I. <u>DIRECT LIABILITY</u>.

Under the Eighth Amendment, a prison official may not act with deliberate indifference to a substantial risk of serious harm to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal citation omitted). Two conditions must be met in order to show deliberate indifference: first, the deprivation must be "sufficiently serious" under an objective standard; second, the prison official must have had subjective knowledge of the risk of harm. *See Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008) (citing *Farmer*, 511 U.S. at 834, 837). "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

To support a claim for relief under 42 U.S.C. § 1983, a plaintiff must show that the defendant, acting under color of state law, deprived him of a right secured by the United States Constitution or its laws. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). "A defendant may not be held liable under § 1983 unless he or she subjected a citizen to the deprivation, or caused a citizen to be subjected to the deprivation." *Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006) (alterations and citation omitted). "[T]o establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton v. City of*

*Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

### A. Direct Causal Link.

The Court begins with the second prong, whether the plaintiff has established a triable issue of fact concerning a direct causal link between the policy or custom and the injury alleged. Mr. McGill frames Jefferson County as a "joint actor" and a "joint moving force" alongside CHC in the underlying alleged constitutional deprivation. However, when the plaintiff describes his theory of the case, the connection is not "direct" but once removed. According to Mr. McGill, Jefferson County entered into a contract with CHC that (allegedly) incentivized CHC to reduce the costs of medical care per inmate per year. Likewise, Jefferson County officials discussed the costs of medical care during monthly meetings and (allegedly) put financial pressure on CHC to keep those costs down by reducing emergent send outs. The connection that Mr. McGill perceives between Jefferson County and the harm he suffered is that the County created financial pressures that led to CHC's developing policies that led to its nurses failing to call a doctor or an ambulance for Mr. McGill on the night he suffered a stroke.

This connection is not direct. Perhaps if Jefferson County officials had instructed CHC in how to train their nurses, or if they had forbidden the number of emergent send outs to rise above a certain level, a direct causal link could be shown. But as the Court sees it, the plaintiff has merely alleged that the County incentivized certain behavior, and that CHC reacted to the incentives by inadequately training its nurses. While CHC's behavior could be said to be a direct cause of the failure to call for emergent care, Mr. McGill has not shown a direct causal link between the deprivation and the County's alleged incentive scheme.

**B. Municipal Policy, Practice, or Custom.**

The facts likewise do not support a finding that the County had a policy, custom, or practice in place that led to Mr. McGill's alleged unconstitutional deprivation. The two questions at issue here are whether the contract between the County and CHC created an unconstitutional policy, and whether alleged financial pressures imposed by the County onto CHC created an unconstitutional practice.

1. Contract.

Mr. McGill alleges that the contract entered into between the County and CHC incentivized cost-saving measures that reduced the adequacy of medical care in the jail. The contract provided that CHC was responsible for the first $50,000 of offsite care for each inmate per year. *See* [ECF No. 104-8 at 5]. Once that amount was reached, liability shifted to Jefferson County. *See id.* Mr. McGill claims that this contract constituted a "policy" of the County, and that the policy was the underlying cause of deliberate indifference to his medical needs. The Court already addressed such a contention in its earlier Order. In particular, the Court found that Mr. McGill only alleged that the contract "incentivizes (but does not in and of itself establish) a policy or practice favoring delay in the provision of emergency medical care to inmates." June 27, 2014 Order [ECF No. 103] at 13.

Mr. McGill now contends that the contract is in fact a policy because it establishes a "fixed plan of action" regarding the provision of medical care for inmates at the Jefferson County Detention Facility ("JCDF"). *See* [ECF No. 120 at 13 n.8]. That is not the case. The contract creates no plan of action regarding the treatment or care of inmates. It simply establishes a payment structure for medical bills. The Court again finds that the contract is not a

policy in itself and likewise rejects Mr. McGill's theory that all "[g]overnmental agreements constitute actionable 'policy' decisions." *See id.*

Furthermore, all of the individuals who treated Mr. McGill on the night he suffered his stroke have declared that they were unaware of the contract and its payment scheme. *See* Brill Decl. [ECF No. 104-1] at ¶ 4; Battenhouse Decl. [ECF No. 104-2] at ¶ 4; Conner Decl. [ECF No. 104-3] at ¶ 4; Arthur Decl. [ECF No. 104-4] at ¶ 4. Ms. Loetscher-Whetstone, the Health Services Administrator ("HSA") at the time of the incident testified that she was unaware of the contract provision while a charge nurse at JCDF, and only became aware of the payment scheme when she became HSA. Pl. Loetscher-Whetstone Dep. [ECF No. 120-4] at 127:13–23.[1] She also stated that she never spoke about the payment cap to any of her charge nurses while acting as HSA, and that based on her understanding the charge nurses were unaware of it. Def. Loetscher-Whetstone Dep. [ECF No. 104-10] at 145:12–18. She maintained that she never instructed any of her charge nurses not to send someone out because of costs or because of the cap, nor was she instructed to act in such a manner. *Id.* at 145:19–25; 146:1–2. Plaintiff's counsel asked Ms. Loetscher-Whetstone whether patients were kept in the jail after their medical care exceeded $50,000. Ms. Loetscher-Whetstone responded that no action was taken on account of an inmate "hit[ting] a tally," but instead "[w]hen their care was done at the hospital, then they would come back to either the jail or the most appropriate place." Pl. Loetscher-Whetstone Dep. [ECF No. 120-4] at 128:12–17.

No evidence has been provided disputing the sworn testimony that none of Mr. McGill's providers knew who bore the cost of sending an inmate out for emergent care. As such, there could be no way for this information to have *directly* affected their medical care decisions on the

---

[1] The Court uses "Pl." and "Def." before the title of the deposition to indicate to which party's brief the testimony was attached. The Court is not differentiating based on which attorney was conducting the deposition at the time.

night of the incident.  While Mr. McGill is free to pursue a theory that the contract incentivized CHC to improperly train its nurses, such a theory does not establish a direct causal link between the contract provision and the alleged constitutional violation at issue in this case.

### 2. *Financial Pressures*

Mr. McGill maintains that during monthly meetings (referred to as MAC meetings), Jefferson County officials would discuss cost-containment measures that put pressure on CHC to consider cost when providing medical treatment.  As a result of such pressure, Mr. McGill maintains that CHC did not act in the best interests of the patient if the medical care would prove too costly.  The facts presented, however, do not support such a theory.

Viewing the evidence in the light most favorable to the plaintiff, the most plaintiff-friendly deposition testimony comes from Dr. Brill, the CHC doctor who ultimately diagnosed Mr. McGill with a stroke.  Dr. Brill testified that Jefferson County Director of Operations Mike Fish "says, [i]f somebody needs to go out, send them out, but please don't send people that don't need to go out."  Pl. Brill Dep. [ECF No. 120-8] at 54:5–7.  According to Dr. Brill, Mr. Fish would discuss the increased number of emergent send-outs at nearly every MAC meeting he attended, expressing the sentiment that "it would be nice to reduce them."  *Id.* at 54:8–16.

That said, Dr. Brill testified that he has never felt pressure from Mr. Fish or anyone else with respect to ER send-outs, nor has he been told he sends people out too often.  *Id.* at 54:2–7; *see also* Def. Brill Dep. [ECF No. 104-11] at 55:2–10; 203:25; 204:1–12.  He has also never been asked to evaluate prior ER send-outs to determine whether the inmate did in fact need emergent care, and has never received any feedback about inappropriate ER send-outs.  Pl. Brill Dep. [ECF No. 120-8] at 54:17–25; 55:1.  Dr. Brill made statements to the same effect in a

declaration on file in this case, adding that he was not aware of any instruction to reduce ER send-outs being given to any CHC employee. Brill Decl. [ECF No. 104-1] at ¶ 4.

In fact, Dr. Brill felt that Mr. Fish's focus on the need to decrease send-outs related to overall costs and staffing problems, a resources issue. *See id.* at 80:17–24; 81:15–22. He explained that the discussion of ER send-outs at MAC meetings appeared to be statistical in nature, simply discussions on the change and type of ER send-outs month-to-month. *Id.* at 183:3–6; 183:17–25; 184:1–2. While cost-saving measures cannot be used to justify subpar medical treatment, it is also not unconstitutional to speak about the cost of medical care so long as those concerns do not result in the provision of inadequate care.

Ms. Loetscher-Whetstone testified that one of her responsibilities was to report to Mike Fish regarding how many inmates were being treated in outside facilities, at which facilities, and for what reasons. Pl. Loetscher-Whetstone Dep. [ECF No. 120-4] at 125:8–10. Like Dr. Brill, she testified that during the monthly MAC meetings the costs of health care were sometimes discussed, as well as the number of people who had been sent to the ER that month. *Id.* at 125:13–21. Also like Dr. Brill, she explained that she did not review the ER send-outs to see if they were appropriate, and that she had no knowledge of anyone ever asking for that to be done. *Id.* at 125:22–25; 126:1–4.

During his deposition, Mr. Fish explained that one of his roles is to monitor and keep track of costs associated with medical care. Pl. Fish Dep. [ECF No. 120-7] at 69:2–9. With regard to costs, he explained that "we don't not send people out or not send people off to the ER trying to save money. Our goal is to provide good medical care regardless of the cost." *Id.* at 69:16–18. Furthermore, Mr. Fish clarified that during MAC meetings "[w]e don't discuss saving

money. We discuss, What can we do to improve the care? What equipment can we buy? What provider can we bring in? It's always about providing the care." *Id.* at 69:22–25.

Plaintiff's counsel asked Mr. Fish whether it was one of his goals to reduce the number of ER send-outs, to which Mr. Fish replied, "One of my goals is to look at what I can buy, what provider I can bring in, what can I do. And if we reduce the send-outs, based on getting those things done and still providing the adequate care, then yes." *Id.* at 76:22–25; 77:1. Mr. Fish explained that "decisions aren't made based on cost. Decisions are made based on what's best for the patient. And those decisions are always made by medical professionals, not security staff, not deputies, not me. Always based on best medical practices." *Id.* at 78:3–7. Mr. Fish explained that the County expects for CHC to act in the best interests of the patient. *See id.* at 78–80. In fact, Mr. Fish has never seen a statistic tracking the costs of medical care per inmate, *see id.* at 115:23–25; 116:1–11, nor has he ever seen a situation where Jefferson County released an inmate based on rising medical costs, *see id.* at 80:5–16.

Finally, Plaintiff's counsel asked Mr. Fish a series of questions concerning security costs associated with sending an inmate out of the jail for treatment, and the costs of calling an ambulance. *See id.* at 71–75. However, none of Mr. Fish's answers in any way implicated Jefferson County as attempting to save costs, but instead CHC. *See id.* Furthermore, Mr. Fish testified that no one had ever discussed with him how much CHC pays for out-of-jail medical care. Def. Fish Dep. [ECF No. 104-9] at 82:7–19.

Nurse Battenhouse, a CHC nurse who treated Mr. McGill on the night in question, has avowed that she was "never told not to send inmates out to outside medical facilities if medical staff deemed send-out necessary. I was never told to reduce out-of-facility send-outs nor was I aware of that instruction being given to any other employee of CHC at any time during my

9

employment." Battenhouse Decl. [ECF No. 104-2] at ¶ 4. Nurses Conner and Arthur, two other CHC nurses who likewise treated Mr. McGill that night, made the same statement in their declarations. Conner Decl. [ECF No. 104-3] at ¶ 4; Arthur Decl. [ECF No. 104-4] at ¶ 4. Nurse Battenhouse also testified that no one at CHC had ever spoken with her about how much money it costs to treat a patient or to send them to the hospital. Def. Battenhouse Dep. [ECF No. 104-13] at 168:16–19. Nurse Conner gave similar testimony. Def. Conner Dep. [ECF No. 104-16] at 115:13–16. Nurse Arthur testified that she never saw resistance to sending inmates to the hospital, nor was she trained regarding the financial implications of hospitalization. Def. Arthur Dep. [ECF No. 104-17] at 81:22–25; 82:1–2. The plaintiff has provided no evidence contradicting these statements or otherwise demonstrating a genuine dispute of material fact concerning them.

Finally, Dr. Herr, Dr. Brill's predecessor and current Chief Medical Officer for CHC and HSA, testified that he never heard discussions of cost-containment during MAC meetings when he was the doctor at JCDF. Pl. Herr Dep. [ECF No. 120-1] at 135:13–20. As compared to Dr. Brill, Dr. Herr sent out far fewer patents for emergent care. *See id.* at 136:12–15. In spite of this manifest increase in send-outs, Dr. Herr testified that "[t]here's no one saying, Oh boy, don't send people out that need care, because that's not – that's not our philosophy. It never has been." *Id.* at 122:6–9.

Sheriff Mink attaches (restricted) documents to his motion that outline statistics showing that the number of ER send-outs actually increased in the years leading up to and including 2012, the year in which the incident took place. For example, in 2010 there were a total of 56 ER send-outs. [ECF No. 105 at 1]. In 2011 that number increased to 67, *id.* at 2, and in 2012 it increased to 169, *id.* at 3. The increase in ER send-outs positively correlates with CHC's hiring Dr. Brill in

October 2011. From January through September 2011, the monthly number of ER send-outs ranged from 1 to 6, with an average of 3.22 send outs per month. From October through December 2011, the monthly send-outs ranged from 12 to 14, with an average of 12.66 per month. In 2012 the monthly number of ER send-outs ranged from 7 to 23, with an average of 14.08 per month. In September 2012, the month when Mr. McGill suffered a stroke, the jail sent 19 inmates out for emergent care, well above that year's monthly average. According to the defendant, these statistics establish that there was no policy, custom, or practice on the part of the County to reduce the number of send-outs. While the Court does not agree that these statistics concretely *establish* such a fact, they certainly do not support the plaintiff's position that financial pressures had an impact on the amount of emergent send-outs at the time he suffered his stroke.

The plaintiff attaches (restricted) minutes from some of the monthly MAC meetings in support of his opposition to the defendant's motion. However, these minutes do not establish a genuine dispute of material fact concerning whether the County placed undue financial pressure on CHC to reduce the number of ER send-outs *prior* to Mr. McGill suffering his stroke. The first set of minutes is dated November 18, 2011, and its only reference to ER send-outs is a note that "[t]here has been an increase of ER send outs; Stephanie is keeping a close eye on those outpatient appointments." [ECF No. 121-1 at 3]. This statement is found under the title "New Business." The next set of minutes is dated December 16, 2011 and under the title "Review of Statistics from previous month" the following statement is made: "ER/Inpatient numbers increased by two. The majority of these ER send outs are Chest Pain. The change that has taken place is that all inmates with a history of Diabetes and HTN/Cardiac issues will have a baseline EKG completed. EMTs are already scheduling these for the next clinic day." *Id.* at 4.

11

No other set of minutes have been attached for meetings that took place before Mr. McGill suffered his stroke. And these two sets of minutes establish nothing more than awareness on the part of the County that emergent send outs had increased. If anything, it would be a matter of concern if the County did not track the medical care provided to its inmates. Yet simply tracking it does not mean that financial pressures were placed on medical staff. If anything, it appears that the County looked into the reason for the increased number of send-outs so that it could more effectively treat patients in advance of an emergency arising.

The other sets of minutes all post-date Mr. McGill's stroke. Whether they can be said to show an unconstitutional policy, practice, or custom of the County is irrelevant, as a policy that post-dates Mr. McGill's stroke cannot be said to have been a direct cause of it. The Court did review these documents to ensure that they did not refer to customs or practices pre-dating his stroke, and nothing contained within them suggests that they do. This is not surprising considering that the meetings took place each month presumably to discuss new developments.

Viewing this evidence, as a whole, in the light most favorable to the plaintiff, the Court finds that there is no genuine dispute of material fact concerning whether Jefferson County had a practice of applying financial pressure resulting in decreased emergent send outs. The statistics show, and the witness testimony supports, that emergent send outs increased during the time in question, and that if any financial pressure existed, it did not affect the nurses or Dr. Brill in determining whether to send a patient (or specifically Mr. McGill) to the ER.

## II. **INDIRECT LIABILITY**.

The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate

medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *West v. Atkins*, 487 U.S. 42, 56 (U.S. 1988); *see also Nieto v. Kapoor*, 268 F.3d 1208, 1216 (10th Cir. 2001). The state's duty to provide adequate medical care is non-delegable. "[T]he State cannot, by choosing to delegate its constitutional duties to the professional judgment of others, thereby avoid all liability flowing from the attempted fulfillment of those duties under Section 1983." *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1229, 1244 (D. Colo. 2008) (citing *West*, 487 U.S. at 56 n.14). Indeed, if "a city's lawful policymakers could insulate the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988). Simply put, "if a local government delegates final policy-making authority to a particular employee, any custom or policy created by that employee is the custom or policy of the local government as well." *Herrera v. Cnty. of Santa Fe*, 213 F. Supp. 2d 1288, 1292 (D.N.M. 2002).

Sheriff Mink admits that he has a non-delegable duty to provide medical care to inmates at the county jail, but he argues that at the motion for summary judgment stage, the plaintiff must come forward with specific facts showing that the municipality itself had a policy, practice, or custom of not providing emergent care to inmates. *See* [ECF No. 130 at 1-2]. He argues that Mr. McGill "may no longer rely on his allegations against CHC or unsubstantiated theories." *Id.* at 1. According the defendant, because Section 1983 does not support *respondeat superior* liability, the County cannot be found liable for allegations concerning CHC policies.

The defendant does not explain these seemingly incompatible viewpoints. The Court can (and did) grant summary judgment in favor of the defendant on a direct liability theory, but it cannot absolve the County of indirect liability if a jury finds that CHC did in fact have a policy,

13

custom, or practice in place that directly caused the alleged constitutional deprivation. Mr. McGill does not rely on a theory of *respondeat superior* liability, which would render the County automatically liable for the acts of its employees regardless of the existence of an unconstitutional policy, custom, or practice. *See Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 692–94 (1978). Instead, the plaintiff claims that CHC provided constitutionally inadequate training to its nurses that directly resulted in the nursing staff's failure to call a doctor or an ambulance when Mr. McGill presented with signs of a stroke. This theory alleges a policy, practice, or custom of CHC, which may be attributed to the County through the non-delegable duty doctrine. As such, the Court cannot dismiss Sheriff Mink from this action entirely, even though it dismissed the direct liability claim. Insofar as the defendant seeks summary judgment on indirect liability, the motion is denied.

## ORDER

For the foregoing reasons, Defendant Sheriff Mink's Motion for Summary Judgment [ECF No. 104] is GRANTED IN PART and DENIED IN PART.

DATED this 24th day of October, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge